Filed 11/13/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S044693 |
| v. | ) | |
| | ) | |
| RANDALL CLARK WALL, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. CR133745 |
| _____ | ) | |

Defendant Randall Clark Wall pleaded guilty to the first degree murders of Katherine and John Oren. (Pen. Code, § 187; all undesignated statutory references are to this code.) Wall also pleaded guilty to four special circumstances: that he committed multiple murders, and that the murders were committed while lying in wait, in the commission of a robbery, and in the commission of a first degree burglary. (§ 190.2, subds. (a)(3), (a)(15), (a)(17)(A), (a)(17)(G).) In addition, he pleaded guilty to robbery (§§ 211; 212.5, subd. (a)), conspiracy to commit robbery (§ 182, subd. (a)(1)), burglary (§§ 459, 460), and conspiracy to commit burglary (§ 182, subd. (a)(1)). A jury found true dangerous and deadly weapon allegations with respect to the robbery, burglary, and one of the murders. (§ 12022, subd. (b).) At the penalty phase, the jury returned a verdict of death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) We affirm the judgment.

# I. FACTS

## A. Evidence of Guilt

Wall was tried jointly with his codefendant John Richard Rosenquist before dual juries. Before the guilt phase began, Wall pleaded guilty to first degree murder, burglary, robbery, and conspiracy to commit burglary and robbery, but denied use of a dangerous and deadly weapon. The prosecution presented the following evidence during the guilt phase of Wall and Rosenquist's joint trial. The defense did not present guilt phase evidence.

### 1. *Wall meets the Orens*

Wall met Katherine Oren, John Oren, and the Orens' great-grandson J.D. in 1990. Wall was introduced to the family through the Orens' granddaughter Tammy, whom he had met that spring. After staying at Wall's parents' home, Tammy and Wall spent at least two weeks in a tent in the Orens' backyard in San Diego. During this time, Wall and Katherine argued frequently, and according to Tammy, Katherine accused Wall of stealing from her. Tammy described the situation as "a bad mixture," and Katherine eventually insisted that Wall and Tammy leave the Orens' property and had John drop them off at a nearby freeway entrance.

### 2. *J.D. is sexually assaulted and the Orens are murdered*

On the night of March 1, 1992, Wall and Rosenquist entered the Oren residence. Ten-year-old J.D. heard noises coming from John's bedroom after he had gone to bed. The parties stipulated that Rosenquist later entered J.D.'s room. Rosenquist took off his clothes, forcibly removed J.D.'s clothes, and covered J.D.'s face with a pillow. According to the stipulation, Rosenquist then inserted his finger into J.D.'s anus, used his own hands and J.D.'s legs to masturbate, and

2

ejaculated on J.D. Some time thereafter, Rosenquist and Wall left the house and J.D. went back to sleep.

The following morning, J.D. found John lying motionless on the floor and was unable to open the door to Katherine's room. J.D. ran across the street to ask his neighbors for help. The neighbors called the police, and an officer, Troy Owens, arrived at the Orens' house. He found John lying on the floor and determined that he had no vital signs. With the help of two firefighters, Owens pushed Katherine's door open and found her body.

The detective investigating the crime scene found several metal bars, including one near John's body. There were blood stains splattered on the walls, headboard, and ceiling of John's bedroom, as well as bloody footprints throughout the house. The district attorney presented evidence at trial that the footprints matched the types of shoes worn by Rosenquist and Wall. John's room appeared to have been ransacked: his dresser drawers had been emptied and stacked on his bed, and a can in which he kept change was found emptied in the hallway. An autopsy revealed seven serious blows to John's head, stab wounds on his neck, rib fractures, and lacerations on his liver and one of his kidneys. At trial, forensic pathologist Dr. Christopher Swalwell testified that blunt force trauma to John's head, with the contributing cut and stab wounds, caused his death. Katherine's autopsy revealed stab wounds on her neck and lower arm, bruising on her arms, face, and back, and several rib fractures. Swalwell testified that Katherine's death was caused by a "large cut wound of the neck."

3. *Wall and codefendant Rosenquist travel to San Francisco*

Early on the morning of March 2, 1992, a witness saw a car that looked like the Orens' yellow and green Mercury traveling quickly on the highway in San Diego. A few hours later, John's credit card was used at a gas station north of Los

3

Angeles. The district attorney presented evidence that the signature on the credit card receipt matched Wall's handwriting.

An employee with the federal Bureau of Land Management, David Kessler, found Wall and Rosenquist in a remote part of San Luis Obispo County later that day. When asked, Wall and Rosenquist gave fake names and said their car had broken down and had been towed, but that they decided not to ride along with the tow truck. Kessler gave them a ride to a motel, where the owners gave Wall and Rosenquist dinner and a room. Kessler then reported this encounter to the San Luis Obispo Sheriff's Office because "it just didn't feel right."

Wall and Rosenquist left the motel the next morning and walked in the direction of San Luis Obispo. They were stopped by a San Luis Obispo County deputy sheriff who asked them for identification, patted them down for weapons and found that they each were carrying pocket knives, searched their duffel bag and found a lot of change, and then let them go. On March 4, 1992, the Orens' car, along with John's wallet, was found burned in a ditch in the same remote area where Kessler had picked up Wall and Rosenquist.

### 4. *Wall is interviewed and arrested*

On March 17, 1992, San Francisco homicide detectives approached Wall as he exited a social services office in San Francisco. They brought him to the San Francisco Hall of Justice, where he waited in an open interview room for about five hours for two San Diego police officers to interview him.

During the guilt phase, the district attorney played a portion of this interview. In the interview, Wall at first denied knowing Rosenquist and denied traveling to San Francisco from Mexico. But after some back and forth with the detectives, Wall explained that he met Rosenquist in Salt Lake City and traveled with him to San Francisco, then Mexico, and back to San Francisco in the beginning of March. Wall said they took a trolley from the Mexican border to San

4

Diego and walked along the freeway around March 1, 1992. Several hours into the walk, according to Wall, Rosenquist left to find a car and returned with one, although Wall said he did not know where Rosenquist had acquired it. From there, Wall said they stopped for gas off the highway once and then later, at Rosenquist's request, drove off the main roads; eventually, the car got stuck on a side road. He said that he and Rosenquist headed north toward San Francisco with help from the Bureau of Land Management employee and the motel owners in San Luis Obispo County, and that he had not seen Rosenquist in over a week.

After the interview, a search warrant was executed for the apartment where Wall was staying on Third Street in San Francisco. The officers found Rosenquist there, along with a knife, a black bag, and a signed written agreement between Rosenquist and Wall concerning a share of their "partnership" if "Wall has done what he is supposed to do."

### 5. *Wall discusses the crime while detained*

The district attorney also introduced evidence from three jailhouse informants. Raynard Davis testified he was housed in the San Francisco County jail on charges of selling crack cocaine. While in custody, Davis overheard Wall say he was "fighting some murders" that included "chopping up peoples [*sic*]." According to Davis, Wall told him over chess that the district attorney "can't prove shit" because Wall wore socks over his hands as he committed the offenses. Wall also told him he had "chopped" his victims with a "stick" or "metal pipe."

A second informant, John Fitzgerald, testified he saw Wall get into several confrontations while in jail in San Diego. During one of them, Fitzgerald stated that Wall said "he had already killed a couple of the people, he didn't mind killing him as well." Later, after Wall's preliminary hearing, Fitzgerald testified that Wall told him that a witness in his case who had sold crack cocaine and was

5

housed in San Francisco County jail "was not going to last long anyway," which Fitzgerald understood to mean that Wall "was going to have him taken care of."

The third informant, Shawn Taylor, was also in custody with Wall in San Diego. He testified that he became friends with Wall and that Wall told him that "him [*sic*] and his partner, Rosenquist, killed an old couple and ransacked their house." Wall specified that Rosenquist had killed the man and that Wall had beaten the man's wife to death.

**B.      Penalty Phase**

Before the penalty phase, Rosenquist agreed to a sentence of life without parole and waived his right to appeal. The district attorney proceeded to the penalty phase with Wall, and the following evidence was presented to Wall's jury.

*1.      Prosecution evidence*

*a.      Circumstances of the crime*

The prosecution presented testimony concerning a blood smear pattern in John's bedroom from a San Diego detective who had investigated the Orens' home after the murder, as well as a San Diego criminalist who had evaluated blood patterns in the home.

*b.      Wall's confession*

The district attorney played the entirety of the tape of Wall's interview in San Francisco. About an hour into the tape, beginning at the portion not played during the guilt phase, the interviewing detectives questioned the truth of Wall's story and asked him to "start out clean again." They asked if something had happened with Rosenquist, and Wall responded, "Yeah, he kind of pressured me into it . . . ." One of the detectives encouraged Wall to provide more detail: "you're at a crossroad in your life. . . . If you go this way, tell us what happened . . . then you can go on with your life. You can be with your wife and your child

6

and start fresh." Shortly thereafter, Wall said, "I didn't want to do it, but him [*sic*] and I both killed the grandma and grandpa of that household."

Wall explained he had met Tammy several years earlier and had stayed in the Orens' backyard for a few months. He said he had told Rosenquist that he had spent some time in San Diego on their way down to Mexico, and when they came back to San Diego, Rosenquist planned to break into the Orens' home and steal their money and car. When Wall told Rosenquist he did not want to, Rosenquist threatened to kill him.

Rosenquist and Wall walked to the Orens' house the night of March 1, 1992 and waited in the backyard until the Orens fell asleep. Wall said he broke into the house through the back door, which was not locked but had a chain on it. At that point, Wall and Rosenquist both carried metal bars they found in the backyard; according to Wall, only Rosenquist had a knife. Wall said Rosenquist then beat John with the metal bar. When Katherine awoke, Rosenquist also hit her with the metal bar. When J.D. came out of his room crying, Wall said he took him back to his room and "kept him quiet." After a few minutes, Rosenquist came into J.D.'s room and said he wanted to have sex with the boy. Wall thought that was "really sick," but Rosenquist again threatened to kill him, so he left the room.

Wall said that afterward Rosenquist handed him a set of car keys and told him to start the Orens' car. He said that at the time he did not know that Rosenquist had stolen John's wallet or money or that Rosenquist had stabbed either of the Orens. When Rosenquist got in the car, they drove away. Wall described their trip north and then said he and Rosenquist were staying at the same apartment in San Francisco.

The district attorney also played a tape from another interview of Wall, conducted in San Francisco by the same detectives the next morning. In this tape, Wall made statements that contradicted ones he made the night before. Wall said

7

he, not Rosenquist, had "clobbered the old lady" with a metal bar. He also said that Rosenquist gave Wall his knife back before they left the house and that Wall used it to cut the cord to the house's telephone.

### c. Victim impact evidence

J.D. testified that he heard Wall laughing in the hallway when Rosenquist was assaulting him. He testified that his great-grandmother Katherine had a vision impairment. He also said he was hospitalized for about a month after the assault; he received psychiatric care and continued to receive therapy after leaving the hospital.

### d. Prior conviction and unadjudicated criminal acts

The parties stipulated that Wall had been convicted of felony possession of a "very, very small amount" of cocaine in 1991. The district attorney introduced testimony from Dagmar Marie Donner, a former roommate of Wall's. Donner described a physical fight that took place between Wall and her husband after she told Wall to move out of the house.

### 2. Defense evidence

The defense called one witness, Terry Lange, who was one of the two San Diego detectives who had interviewed Wall, and later Rosenquist, in San Francisco. According to Lange, Rosenquist said that after he had assaulted J.D., he covered up the victims' bodies because he was sickened by the blood near them.

The defense then read two stipulations. The first concerned a statement by Rosenquist to a doctor in which he described the victims' bodies: "It was unbelievable. I've never seen anything like that before. He [John] was blowing bubbles." The parties also stipulated that the Orens' neighbor found John's body covered with a blanket the morning after the murder.

8

## II. Jury Selection Issues

### A. Absence From Jury Selection Proceedings

Due to injuries suffered in custody, Wall was absent from portions of jury selection, including the voir dire of six potential jurors, the exercise of peremptory challenges, and the swearing-in of the jury. Wall contends that his absence violated his federal and state constitutional due process right to be personally present during the proceedings against him, as well as his statutory right to be present under sections 977 and 1043. We conclude that Wall validly waived his constitutional right to be present at the relevant proceedings and that although the proceedings violated his statutory right to be present, the error was harmless.

### 1. Background

On August 5, 1994, in the midst of jury selection, Wall was attacked and severely beaten by another inmate in a holding cell during the noon recess. Wall was visibly injured and in need of immediate medical attention. Wall's attorney told the court that he was willing to waive Wall's presence for voir dire that afternoon. In the presence of the court, counsel asked Wall: "Randy, do you agree to waive your presence for the balance of this afternoon's proceedings, understanding that you have a right to be here to be an active participant?" Wall replied, "Yes, I do, your Honor. I'm sorry about this." After Wall left, the prospective jurors were brought in for individual voir dire. The court did not remark on Wall's absence in the presence of the prospective jurors. Of the six jurors brought in that afternoon, one was excused for hardship, two were excused for medical concerns, and three were asked to return.

The court reconvened on August 9, 1994, and confirmed that Wall "understood — understand at this time and understood Friday afternoon that you had an absolute right to be present, but because of the nature of your injuries, we

9

allowed you to withdraw and receive medical attention." Defense counsel said that although he was "concerned as to what kind of shape [Wall] was in," he "believed [Wall] was able to make a knowing, intelligent waiver at the time" and that he had recommended that Wall do so. Defense counsel went on to explain that Wall's jaw had been severely broken, requiring surgery to install a metal plate, and that counsel was "concerned about [Wall's] mental condition" as well and wanted further testing to determine whether Wall had suffered a concussion. Defense counsel also requested a postponement to give Wall time to recover out of concern that Wall's visible injuries would be prejudicial if the jury saw him. After considering the significance of Wall's presence for the jury and the difficulty of reassembling the more than 60 prospective jurors at a later date, the court proposed waiving Wall's presence, advising the jury of a medical emergency, and conducting the remainder of jury selection in his absence. The court sought assurance that Wall was mentally capable of such a waiver, and then ordered postponement of opening arguments until August 24, 1994.

When the court reconvened on August 11, 1994, defense counsel explained that although Wall was still "mildly disoriented" with "some dullness," counsel had discussed the right to be present and the nature of the peremptory challenge proceedings with him on at least three occasions. Counsel said Wall was willing to waive his personal presence and observe the exercise of peremptory challenges from the jury room via a live audio feed. In the presence of the trial court, defense counsel asked Wall if he was "willing to waive [his] presence and sit in the jury room listening to proceedings in that fashion instead" and if he understood he had "a right to be here." Wall said yes. The trial court then directly addressed Wall and asked, "Do you understand what I have just said, Mr. Wall?" Wall responded, "Yeah." Wall was moved to the jury room during the exercise of peremptory challenges and remained there throughout. Before the procedure began, the court

advised the jury as follows: "As you might note, Mr. Wall is not here this morning. There has been a medical emergency. He wants to be here. He has agreed that his lawyers may proceed selecting a jury without him. It is not his fault that he is not here. As I indicated, he wanted to be here, wishes to be here, under the circumstances, he is absent this morning."

After the jury and alternates had been selected, defense counsel again raised the issue of Wall's presence before the court, suggesting they "take waiver of Mr. Wall's presence" for the swearing-in of the jury the next day. Defense counsel said he "explained to Mr. Wall in the last couple of moments that he, of course, has the right, as he has had, to be present tomorrow morning when the jury is sworn" and that he could waive this right and listen from the jury room as he had that day. Addressing Wall directly, defense counsel asked, "Randy, have you understood everything that I have explained to you and are you willing to waive your presence so that we can proceed . . . ?" Wall answered yes. Wall was not in the courtroom when the jurors were sworn in the next day.

### 2. Analysis

Voir dire of prospective jurors is "a critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present." (*Gomez v. United States* (1989) 490 U.S. 858, 873.) A capital defendant may validly waive this right to be present under federal and state constitutional law. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1210 (*Jackson*).) The waiver must be made personally; it cannot be made through counsel. (*Taylor v. Illinois* (1988) 484 U.S. 400, 418, fn. 24.)

Wall contends that the record is insufficient to support the conclusion that the waivers on August 5 and 11 were voluntary, knowing, and intelligent, and that the waivers were improperly administered by counsel rather than the court. Wall argues that his medical condition undermined his ability to intelligently waive his

11

right to be present, as did the alleged absence of advisement as to the existence and importance of the right to be present.

The record shows that Wall was advised once on August 5 and twice on August 11 of his right to be present at voir dire, during the exercise of peremptory challenges, and at the swearing-in of the jury. Wall's counsel also discussed at some length the pros and cons of waiver while Wall was present in court on August 9. Although the August 5 and August 11 waivers were administered by defense counsel, counsel's allocution was conducted under the supervision of the trial court, who observed Wall personally and expressly waive his right to be present. It is true that on August 9 Wall's attorney and the trial court expressed some concern as to his mental capacity following the attack. In addition, on August 10, defense counsel presented the results of neurological testing on Wall to the court and thought Wall was "at least mildly disoriented" and "very slow on the uptake." But on August 11, though counsel noted that Wall remained "mildly disoriented" and was "moving very slowly," counsel told the court that he had repeatedly discussed the right to be present and the significance of the waiver with Wall and that "Wall remains of the position that he is willing to waive his presence." Defense counsel and the court were well situated to determine whether Wall had the requisite capacity to waive his rights and understand the nature of the rights he was waiving. We have not required any higher standard for a waiver under similar circumstances. (See *People v. Weaver* (2001) 26 Cal.4th 876, 966–967 (*Weaver*).)

Although Wall validly waived his constitutional right to be present, his absence during the selection and empaneling of the jury violated his statutory right to be present under sections 977 and 1043. "[W]hen read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior

12

under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1)." (*Jackson*, *supra*, 13 Cal.4th at p. 1210.) " 'Section 977 requires . . . that the defendant personally execute, in open court, a written waiver of the right to be present.' " (*People v. Romero* (2008) 44 Cal.4th 386, 418.)

The Attorney General concedes that "[b]ecause Wall did not personally execute a written waiver, his statutory right to be present . . . was violated" during "the questioning of six jurors on August 5th, the exercise of peremptory challenges on August 11th, and the swearing of the jury on August 12th." Nevertheless, the Attorney General argues, Wall is "estopped" from arguing he is entitled to relief because he "orally waived his right to be present" and "his counsel acquiesced in that procedure." But we have not recognized such an exception to the statute's requirement of a written waiver. (§ 977, subd. (b)(2).) The Attorney General relies on *People v. Howze* (2001) 85 Cal.App.4th 1380, but the Court of Appeal there concluded that although the defendant's refusal to leave his cell constituted a waiver of his *constitutional* right to be present at the start of trial, the failure to obtain a written waiver violated section 977. (*Howze*, at pp. 1395–1396.)

Although the trial court committed statutory error by failing to obtain a written waiver from Wall before allowing selection and empaneling of the jury to proceed in his absence, it is not reasonably probable that a result more favorable to Wall would have been reached in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; cf. *Jackson*, *supra*, 13 Cal.4th at p. 1211 [applying *Watson* where defendant did not execute a written waiver of right to be present at taking of evidence during prosecution's presentation of its case]; *Weaver*, *supra*, 26 Cal.4th at p. 968 [applying *Watson* where defendant did not execute a written waiver of right to be present at the taking of evidence during sanity phase].)

13

Wall argues that the "reshuffling" of prospective jurors between voir dire and the exercise of peremptory challenges "undermined whatever input appellant previously had contributed," so Wall was unable to effectively contribute to his attorney's exercise of peremptory challenges. But Wall offers no specific argument as to why or how counsel might have exercised these challenges differently. Further, Wall was able to hear the proceedings and could have interrupted to confer with his attorney, but he did not do so.

Wall also argues that he was prejudiced by his absence during jury selection and the swearing-in of the jury because his presence "was essential . . . so that appellant, his counsel and the court could observe and take into account the demeanor of the prospective jurors, as they in turn observed appellant." Although a defendant's presence may have a psychological impact on the jury at certain stages of trial, separate and apart from any assistance the defendant might offer his counsel (see, e.g., *Larson v. Tansy* (10th Cir. 1990) 911 F.2d 392, 395–396), we find no reasonable probability in this case that a different jury would have been chosen or that the jury chosen would have reached a different verdict had Wall been present during the selection and empaneling of the jury. On August 11, before the exercise of peremptory challenges, the trial court advised the jurors that Wall wished to be present but was unable to due to a medical emergency. We can reasonably conclude that the jurors attributed his absence from the short swearing-in session the next day to the same medical emergency. It is true that the court gave no similar advisement to the jury on the afternoon of August 5. But absent specific allegations of prejudice — and Wall has stated none — any harm arising from the voir dire of six prospective jurors outside of Wall's presence that afternoon is merely speculative. Moreover, Wall had been present for most of voir dire and was present for the remainder of trial. We hold that the trial court's

14

failure to obtain a written waiver of Wall's right to be present does not warrant reversal.

**B. Alleged *Witt* Error**

Wall contends that the trial court violated his right to an impartial jury under the federal and state Constitutions by erroneously excusing Prospective Juror E.J. for cause because of her views on the death penalty. (See *Wainwright v. Witt* (1985) 469 U.S. 412, 424.) "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Cunningham* (2001) 25 Cal.4th 926, 975, quoting *Witt*, at p. 424.) "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 10.)

*1. Background*

On her juror questionnaire, Prospective Juror E.J. said she would not automatically vote against death "no matter what evidence might be presented or argument made." She indicated that persons convicted of "mass murder for political or financial gain" should automatically receive the death penalty. E.J. said she "adhere[d] to Methodist teachings," but when asked if she had any spiritual or religious beliefs that "pertain to the issue of the death penalty vs. life in prison without the possibility of parole," or if her religious beliefs "would prevent [her] from passing judgment in a criminal matter," she answered no. When asked, "do you feel you are able and willing to colmpletely [*sic*] put aside any thought or concern relating to penalty issues while you deliberate guilt or innocence at the

15

guilt phase trial on these charges?" E.J. responded, "I can only say I hope so. After hearing evidence I am not sure how I will react."

During voir dire, in response to questions by defense counsel, E.J. reiterated that she would not automatically vote for life without parole. However, she also expressed hesitation about her ability to impose a death verdict: "I'm not sure about how I would feel having to make a determination about whether a man or woman receives the death penalty." In response to questions from the court concerning whether she could vote for the death penalty in the appropriate case, she said, "I feel that I'm not the one to make a judgment on something like that" and said she had "a problem with dealing with that particular part of being a juror." In response to repeated questions by the trial court and the prosecutor as to whether she had the ability to impose the death penalty, E.J. said she did not know if she did.

The prosecutor challenged E.J. for cause, citing her uncertainty as to whether "she has the capacity to uphold the death penalty." The trial court took the challenge under submission, noting it was a "close question." Eight days later, after the close of voir dire, the trial court dismissed E.J. for cause, stating: "And in going through these transcripts, I noticed a lot of people said statements like, I think that I can but I don't, this that. That, in and of itself, is not grounds for cause. It is where somebody says, 'I don't know' or 'I can't make a decision one way or the other,' and . . . I think that [E.J.] is a cause challenge on the behalf of the People."

2.    *Analysis*

Wall argues that Prospective Juror E.J. is analogous to Prospective Juror C.O. in *People v. Pearson* (2012) 53 Cal.4th 306, 328–330. Both prospective jurors, Wall contends, were merely uncertain about what they would do in a particular case and maintained they would be able to keep an open mind until

16

confronted with all of the relevant evidence. But E.J. repeatedly expressed uncertainty not as to her own views on the death penalty or the appropriateness of the death penalty in any particular case, but as to her ability to impose a death sentence. C.O., by contrast, although expressing uncertainty as to whether she approved of the death penalty as a policy, was consistent in asserting "her ability to vote for a death penalty in a factually appropriate case." (*Pearson*, at p. 330.) As the trial court noted, E.J. said she did not know whether she had the ability to impose the death penalty. E.J.'s answers provide substantial evidence that she "harbored very serious doubts concerning whether, if seated on a capital jury, she could ever personally vote to impose the death penalty." (*People v. Jones* (2012) 54 Cal.4th 1, 43.) We therefore decline to find constitutional error in the trial court's decision to excuse juror E.J. for cause.

### III. PENALTY PHASE ISSUES

#### A. Admission of Allegedly Coerced Confession

Wall argues that the trial court committed constitutional error in admitting into evidence during the penalty phase the tape-recording and transcript of Wall's confession to San Diego police officers while in custody in San Francisco. According to Wall, the confession was obtained through psychological coercion and improper inducement as a result of the detectives' exploitation of Wall's "expressed fear of codefendant Rosenquist" and their promise that Wall could "be with [his] wife and [his] child and start fresh" if he told them "what happened." Because the confession was the "centerpiece of the prosecution's case for death," Wall contends the jury likely would not have found the aggravating evidence substantial enough to warrant a death sentence if the confession had been excluded.

17

### 1. Background

On March 17, 1992, San Francisco homicide detectives approached Wall in San Francisco. He was transported to the San Francisco Hall of Justice, where he waited in an open interview room for about five hours until two San Diego police detectives, Carl Smith and Terry Lange, arrived. During this time, Wall was told he was permitted to leave, and he used the restroom unescorted, attempted to make two phone calls, and was provided with food and drink by San Francisco officers. Upon arriving, the San Diego detectives told Wall he was not under arrest but suggested he may be a "witness" in a "fairly serious crime" and read Wall a *Miranda* warning. The interview began at 10:00 p.m. and lasted for almost two hours.

Wall initially said he came straight into San Francisco from Salt Lake City, but the detectives quickly informed him that they knew police had stopped him and Rosenquist near a car belonging to a murder victim from San Diego and that they were seeking information about where he and Rosenquist had obtained the car. After being told to "start over," Wall then said that he had met Rosenquist in Salt Lake City and that they had traveled together to San Francisco, then Mexico, and then to San Diego via trolley. In San Diego, Rosenquist said he would "get some transportation or whatever and some money," at which point he left Wall on the Interstate 5 freeway and came back with a car and a black bag of change. The detectives asked a series of detailed follow-up questions, primarily about Wall's statement that Rosenquist had made a separate trip to obtain a car and about the two men's journey back up to San Francisco. In his responses, Wall said he was divorced and had a three-year-old daughter, he last saw his ex-wife about a month earlier, and he came to California in the hope of getting a good job so he could "send back for" his ex-wife, whom he hoped to remarry.

18

After almost an hour of questioning, the detectives returned to Wall's initial statement about coming straight from Salt Lake City and asked why Wall "started to lay out a bullshit story about Salt Lake." Wall said he was "scared" and did not "want any problems . . . [and] would like to get back to Salt Lake and take care of my wife and kid." Detective Smith responded that he and Detective Lange "get this feeling that you're really not telling us the whole truth," that "[i]f you don't tell everything that happened or everything you know, then what you've told us really isn't real significant." The detectives suggested Wall may have been faced with a situation that got out of control. The following colloquy then occurred:

"Wall: Yeah, he kind of pressured me into it and . . .

"Detective: Why don't you tell me about the part . . .

"Wall: Ah . . .

"Detective: Tell me about what you left out, okay? I know it's tough 'cause I can see that it's really bothering you a lot. But why don't you just tell me how it happened, what happened, and, and let's get this, let's put this behind us okay? Because we know what happened. We wouldn't, we didn't, just didn't pick your name out of a hat, you know what I'm saying? . . . We're here for a reason Randy. And, and that's what we want you to tell us. Because you're at a crossroad in your life and you've got two directions to go; you could go this way or you could go this way. And if you go this way, you're gonna stay stuck all your life. If you go this way, tell us what happened, let's get it out in the open, let's put it behind you, then you can go on with your life. You can be with your wife and your child and start fresh. And that's what we want to do is let's start fresh, okay?

"Wall: Okay. Can you promise me one thing?

"Detective: What's that?

19

"Wall:  He's told me that, ah, something like this might happen and I'd get pressured into it, and the pressure would come down and he'd find out then, and ah, that he had connections all over the place, and he will have me killed."

The detective turned over the photograph of Rosenquist on the interrogation table.  Reiterating that he and Lange had "just came 600 miles to talk to you so that you would tell us the truth," Smith told Wall that "he [Rosenquist] sounds like a bullshitter to me" and that Wall should not worry about Rosenquist.  After one of the detectives suggested they "start from the beginning" again, Wall said they did not "have to go that far back" and then said:  "Um, probably when we was walking up the freeway, ah, or stopped beside the freeway, going up towards this place.  He sort of ah, pressured me into this.  Um, I didn't want to do it, but him and I both killed the grandma and grandpa of that household."  The detectives began questioning Wall about the killings, and he went on to describe them in detail.

During the guilt phase of Wall's trial, the district attorney played only a portion of the March 17, 1992 interview, stopping before the detectives' challenged statement and Wall's confession.  At the penalty phase, the district attorney played the entire tape of the interview as well as a tape from a short interview conducted the following morning.  Wall's challenge relates only to the effect of the admission of his allegedly coerced confession on the jury's sentence of death.

### 2.    *Analysis*

"Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial." (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).)  A confession is involuntary if the " ' "influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-

20

determined.' " ' " (*People v. Maury* (2003) 30 Cal.4th 342, 404 (*Maury*).) "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.) However, "no single factor is dispositive in determining voluntariness . . . rather[,] courts consider the totality of circumstances." (*People v. Williams* (1997) 16 Cal.4th 635, 661.)

"[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law." (*People v. Boyde* (1988) 46 Cal.3d 212, 238.) An improper promise "must be causally linked" to the defendant's confession to warrant exclusion under the Fifth Amendment. (*Maury*, *supra*, 30 Cal.4th at p. 405; see *id* at p. 404.)

"The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made." (*People v. Carrington* (2009) 47 Cal.4th 145, 169.) "On appeal, we conduct an independent review of the trial court's legal determination" as to the voluntariness of a confession. (*People v. Williams* (2010) 49 Cal.4th 405, 425.) Although we rely on the trial court's factual findings to the extent they are supported by substantial evidence, where, as here, "[t]he facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded," those facts as well as the ultimate legal question are "subject to our independent review." (*Linton*, *supra*, 56 Cal.4th at p. 1177.)

At trial and on appeal, Wall argued that the detectives provided an improper promise of leniency when they told Wall he was at a crossroads and if he took one path — i.e., if he told the truth — he could "go on with [his] life" and "be with [his] wife and child and start fresh." According to Wall, these statements were more than "proper exhortations to tell the truth" (*People v. Holloway* (2004) 33

21

Cal.4th 96, 115) and did not "simply indicate[] a willingness to listen to defendant and encourage[] him to tell what happened" (*People v. Hensley* (2014) 59 Cal.4th 788, 812). Instead, Wall contends the detectives' statements constituted an implied promise that if he told the truth, he would be granted leniency — he would "go on" and "start fresh." (See *Linton*, *supra*, 56 Cal.4th at p. 1174 [detective's promise that defendant "would not 'get in trouble for what happened' " if he told the truth " 'because . . . that's water under the bridge' " constituted an improper promise of leniency].)

The Attorney General argues, however, that any promise of leniency was not the cause of Wall's confession. Under the totality of circumstances, and based on our review of the interview, we agree. Before the detective began his statement about the "two directions" Wall could go, Wall had already begun to tell the detectives about the events in the Orens' home. Wall used almost exactly the same opening sentence when he began describing the events at the Orens' house after the alleged promise of leniency as before: "He kind of pressured me into it" and "he sort of ah, pressured me into this."

Nor did the circumstances of the interrogation or Wall's personal characteristics unduly heighten the pressure on Wall to confess. Before the detectives arrived, Wall was allowed to eat, smoke, make phone calls, and leave the room. The interrogation was delayed until 10:00 p.m. so the detectives could travel from San Diego to San Francisco on short notice. (Cf. *People v. Dykes* (2009) 46 Cal.4th 731, 753 [confession not involuntary where defendant made to wait so officers could travel from elsewhere in the state and defendant allowed to use restroom, eat, and smoke during wait].) Wall was not under arrest at any point before the interrogation and told the San Diego detectives he had come to the station voluntarily. The interrogation itself lasted less than two hours, not an inordinately long period. Although detectives described 23-year-old Wall as

22

"stressed" and "scared," his answers in the interrogation transcript appear coherent and deliberate.

Wall also alleges that the detectives "exploited [Wall's] expressed fear of codefendant Rosenquist." But Wall does not articulate which of the detectives' statements constituted this exploitation. Nor does our review of the interview suggest any exploitation of Wall's fear. Before Wall confessed, the officers told Wall not to think about Rosenquist, said Rosenquist sounded like a "bullshitter," and turned over his picture. At the conclusion of the interview, the detectives told Wall they would do everything they could to protect Wall and house him separately from Rosenquist. These statements came after Wall had confessed and thus were not conditioned on Wall's cooperation. The attempts to assuage Wall's fear did not rely on deception, nor were they attempts to leverage that fear to extract information. No exploitation is apparent.

Because the detectives' promise of leniency was not a cause of Wall's confession, Wall's confession was not involuntary. Therefore, the trial court did not commit constitutional error in admitting it as aggravating evidence pursuant to section 190.3, subdivision (a) during the penalty phase of Wall's trial.

**B.      Exclusion of Conditional Plea Offer as Mitigation**

Wall contends that the trial court prejudicially erred by excluding mitigating evidence of his early offer to plead guilty in exchange for life imprisonment without the possibility of parole. We conclude that the trial court did not abuse its discretion under Evidence Code section 352 and did not commit constitutional error in doing so.

*1.      Background*

On April 20, 1992, about a month after his arrest, Wall offered through counsel to plead guilty to all counts, admit all special circumstances and other

23

allegations, and waive his appeal rights in exchange for a sentence of life imprisonment without the possibility of parole. The district attorney rejected the offer.

During the penalty phase, Wall's counsel sought to introduce Wall's early plea offer as mitigating evidence under section 190.3, factor (k). Counsel explained that Wall offered to plead guilty at an early stage of the proceedings in order to spare J.D. from having to testify and relive trauma, and to assuage Wall's family's fear that he would be sentenced to death; according to counsel, the offer was evidence of remorse. Counsel further argued that in light of rule 4.423(b)(3) of the California Rules of Court (formerly rule 423(b)(3)), which applied to determinate sentencing pursuant to section 1170, subdivision (b) and explicitly identified the "voluntar[y] acknowledg[ment of] wrongdoing . . . at an early stage of the criminal process" as a mitigating factor, an early plea offer should be considered mitigating in the death penalty context as well.

The trial court excluded the early plea offer under Evidence Code section 352 on the ground that it would confuse the jury. While noting it could find no authority on admissibility on this issue, the court expressed concern that if the early plea offer were admitted, the district attorney's reasons for rejecting the plea offer would become relevant and, if offered, would need to be admitted as well. The court expressed concern that the jury would "second guess" the discretionary decision of the district attorney to seek the death penalty after learning that Wall was willing to plead guilty and accept life imprisonment without parole: "The problem I have, though . . . is that the decision, the charging decision whether or not to seek the death penalty is left to the district attorney, and it's not left to the defense, it's not left to the lawyers. It's left strictly to the interest of the chief prosecuting officer acting in his sound discretion whether or not to seek the death penalty. [¶] Once they choose to seek the death penalty, I think it's confusing to

24

the jury because it allows the jury to second guess the working of the district attorney in seeking the death penalty." The trial court also worried that evidence of the earlier offer might open the door to rebuttal by the district attorney of questionable admissibility; the court explained that the district attorney "shouldn't be allowed to get up in front of this jury and say, ladies and gentlemen, the only reason he [offered to plead guilty] is he wants to avoid the death penalty, he's been trying to avoid the death penalty."

### 2. Analysis

"A capital sentencing decision must be individualized, and the sentencing authority must be permitted to consider the defendant's character." (*People v. Peoples* (2016) 62 Cal.4th 718, 757, citing *Lockett v. Ohio* (1978) 438 U.S. 586, 604 (*Lockett*).) "Section 190.3 requires the jury to impose a sentence of life imprisonment without the possibility of parole if the mitigating factors outweigh the aggravating factors" (*Peoples*, at p. 757), and section 190.3, factor (k) makes admissible "[a]ny other circumstance which extenuates the gravity of the crime" as part of this penalty determination.

A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) Evidence Code section 352 gives the trial court discretion to exclude evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

We cannot conclude that the trial court abused its discretion here. Of course, a penalty phase jury must make its own independent evaluation as to the appropriateness of the death penalty; that is what a fair weighing of aggravating

25

and mitigating evidence requires. But that is different from the jury evaluating the district attorney's personal perception of the aggravating and mitigating evidence, or the district attorney's personal assessment of the jury's likely verdict. The trial court was concerned that introducing Wall's plea offer would result in the latter, i.e., that introducing the offer would invite the jury to evaluate the district attorney's plea bargaining tactics rather than evaluating the offer's probative value as mitigating evidence.

We have acknowledged that evidence concerning a party's offer or rejection of a plea can require introduction of tangential rebuttal evidence that will mislead or confuse the jury. (See *People v. Fauber* (1992) 2 Cal.4th 792, 857 [holding no abuse of discretion and no violation of constitutional guarantee in the trial court's exclusion of the prosecutor's plea offer and the defendant's subsequent rejection because admission would require additional inquiry into the underlying reasons of the defendant's refusal, which potentially could confuse and mislead the jury]; cf. *People v. Manning* (2008) 165 Cal.App.4th 870, 879–880 [upholding exclusion of defense expert testimony regarding plea deal because "if defendant's proffered evidence had been admitted, the prosecutor would surely have been entitled to introduce rebuttal evidence to put that evidence in context, including evidence as to the thought processes of the participants in the underlying case"].) Although it may not invariably be the case that a danger of confusing or misleading the jury substantially outweighs a plea offer's probative value, in this case the trial court did not abuse its discretion in refusing to admit testimony about Wall's plea offer.

Wall claims that the trial court erred in concluding that no legal authority supported the admission of an early offer to plead guilty as mitigation, citing *People v. (Michael) Williams* (1988) 45 Cal.3d 1268 (abrogated on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176) and *People v. Ledesma* (2006) 39

26

Cal.4th 641.  But neither case squarely addressed whether a trial court abuses its discretion when it excludes an early offer to plead guilty under Evidence Code section 352.  In *Williams*, we rejected the defendant's claim that the death penalty law violates the Eighth Amendment by preventing introduction of his expressed willingness to plead guilty, since nothing in the death penalty law bars the admission of such evidence.  (*Williams*, *supra*, 45 Cal.3d at p. 1332.)  The trial court in this case excluded evidence of a prior plea offer under Evidence Code section 352, not under the death penalty law at issue in *Williams*.  And in *Ledesma*, the trial court permitted a capital defendant to introduce evidence at the penalty phase that he had attempted to plead guilty and accept life imprisonment without parole.  (*Ledesma*, at p. 735.)  We held that the trial court did not abuse its discretion in excluding "evidence of the circumstances surrounding the plea negotiations."  (*Ibid.*)  We did not mention Evidence Code section 352 or address its application to the admission of evidence of a prior plea offer.

Wall also claims that admission of a defendant's early offer to plead guilty is "fully consistent with the language of the catch-all mitigation provision, section 190.3, factor (k)," and is consistent with California's sentencing guidelines for noncapital cases and analogous federal sentencing guidelines.  But the trial court did not exclude Wall's early offer to plead guilty because it was inadmissible or irrelevant; rather, the trial court excluded it on the ground that the offer's probative value was significantly outweighed by the probability that it would confuse the jury.

Finally, Wall argues that the trial court violated his constitutional right to present mitigating evidence under *Lockett*, *supra*, 438 U.S. 586, 604, and its progeny.  Wall is correct that "a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." [Citation.]  [¶] Once this low threshold for relevance is met, the 'Eighth

27

Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence. [Citations.]" (*Tennard v. Dretke* (2004) 542 U.S. 274, 285.) But nothing in that constitutional rule "limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." (*Lockett*, at p. 604, fn. 12.)

Here, the trial court found that the plea evidence would confuse the jury by drawing its attention to irrelevant information concerning the circumstances of the plea offer and the district attorney's decision to reject it. Such balancing under Evidence Code section 352 is an essential component of a trial court's "traditional authority." (*Lockett*, *supra*, 438 U.S. at p. 604, fn. 12; see *People v. Fauber*, *supra*, 2 Cal.4th at p. 856 [finding no constitutional violation in trial court's exclusion of the defendant's refusal of a plea offer under Evidence Code section 352]; *U.S. v. Fell* (2d Cir. 2008) 531 F.3d 197, 219–220 [finding no error in district court's exclusion of a plea offer as mitigating evidence in part because it "would authorize a confusing and unproductive inquiry into incomplete plea negotiations"]; *U.S. v. Purkey* (8th Cir. 2005) 428 F.3d 738, 756 [Federal Death Penalty Act contains a "more lenient standard" for the admissibility of mitigating evidence to comport with constitutional standards, but still "invests the judge with the authority to exclude probative information during the penalty phase if 'its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.' [Citation.]"].) Under these circumstances, we conclude that the exclusion of evidence of Wall's plea offer did not violate his constitutional right to present mitigating evidence.

Moreover, even if the trial court had committed constitutional error, any error would have been harmless because the jury was aware that Wall had entered an *unconditional* guilty plea to all charges except the allegations of personal use of

28

a deadly weapon and the molestation and rape of J.D. The jury was informed that Wall had entered a plea of guilty on August 24, 1994, to two murders, robbery, burglary, and four special circumstances; the guilt phase addressed only whether Wall personally used a knife or metal stake in the commission of these offenses. In light of the jury's knowledge that Wall had *unconditionally* pleaded guilty prior to trial, there is no reasonable possibility that the jury would have reached a different penalty verdict had it known that Wall sought a *conditional* plea of guilty earlier in the proceedings.

### C. Alleged Cumulative Error

We have determined that although the trial court erred under sections 977 and 1043, the error was not prejudicial. Because we have found only a single error and we have determined it was harmless, there is no prejudice to cumulate.

### D. California's Death Penalty Statute

Wall raises several challenges to California's death penalty scheme that we have repeatedly rejected. We decline to revisit our prior holdings, as follows:

Section 190.2 is not impermissibly broad, and section 190.3, factor (a) does not result in arbitrary and capricious death judgments. (*People v. Jackson* (2014) 58 Cal.4th 724, 773; *People v. Valdez* (2012) 55 Cal.4th 82, 179.)

We have held that "once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense," and therefore *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) does not require the facts bearing on the penalty determination to be found by a jury beyond a reasonable doubt. (*People v. Anderson* (2001) 25 Cal.4th 543, 589–590, fn. 14.) We have held that "[t]he federal Constitution does not require the jury to make written findings unanimously concluding beyond a reasonable doubt

29

that the aggravating factors exist, that they outweigh the factors in mitigation, or that death is the appropriate penalty." (*People v. Merriman* (2014) 60 Cal.4th 1, 106.) We have previously rejected claims that cast the absence of such requirements in contrast with the requirements for the finding of an enhancement and determinate sentencing as a violation of the Equal Protection Clause. (*People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

"Choosing between the death penalty and life imprisonment without possibility of parole is not akin to 'the usual fact-finding process,' and therefore 'instructions associated with the usual fact-finding process — such as burden of proof — are not necessary.' " (*People v. Lenart* (2004) 32 Cal.4th 1107, 1136.) Nor do we require "the prosecution to bear the burden of proof or burden of persuasion at the penalty phase" (*People v. Sapp* (2003) 31 Cal.4th 240, 317) or the trial court to instruct jurors that there is a presumption in favor of life (*People v. Arias* (1996) 13 Cal.4th 92, 190). "We have consistently held that unanimity with respect to aggravating factors is not required by statute or as a constitutional procedural safeguard." (*People v. Taylor* (1990) 52 Cal.3d 719, 749.) In particular, the jury need not reach a unanimous finding on unadjudicated criminal activity under factor (b) of section 190.3, so long as the court instructs " ' "that no juror may consider any alleged other violent crime in aggravation of penalty unless satisfied beyond a reasonable doubt that the defendant committed it." ' " (*People v. Ward* (2005) 36 Cal.4th 186, 222.)

CALJIC No. 8.88's use of the phrase "so substantial" is not so vague that it will lead to arbitrary and capricious sentencing decisions. (*People v. Lomax* (2010) 49 Cal.4th 530, 595.) CALJIC No. 8.88 tells the jury that "the death penalty could be imposed only if the jury found that the aggravating circumstances outweighed mitigating. There was no need to additionally advise the jury of the converse (i.e., that if mitigating circumstances outweighed aggravating, then life

without parole was the appropriate penalty).” (*People v. Duncan* (1991) 53 Cal.3d 955, 978.)

The use of the adjective “extreme” under section 190.3, factor (d), or as read in CALJIC No. 8.85, in describing mitigating circumstances does not impermissibly hinder the jury’s meaningful consideration of mitigating factors. (*People v. Rountree* (2013) 56 Cal.4th 823, 863.) “The trial court has no obligation to delete from CALJIC No. 8.85 inapplicable mitigating factors, nor must it identify which factors are aggravating and which are mitigating.” (*People v. Cook* (2006) 39 Cal.4th 566, 618.) The phrase “whether or not” in section 190.3, factors (d)–(h) and (j) does not unconstitutionally suggest that the absence of a mitigating factor is to be considered as an aggravating circumstance. (*People v. Banks* (2014) 59 Cal.4th 1113, 1207–1208, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; *Cook*, *supra*, 39 Cal.4th at p. 618 [“CALJIC No. 8.85’s use of the phrase ‘whether or not,’ is not an invitation to jurors who find ‘a factor not proven’ to then ‘use that factor as a factor favoring imposition of the death penalty’ ”].)

We have previously held that “[i]ntercase proportionality review is not constitutionally required.” (*People v. Streeter* (2012) 54 Cal.4th 205, 268.) We have also previously rejected claims that California’s death penalty statute violates international norms of decency. (*People v. Adams* (2014) 60 Cal.4th 541, 581–582; *People v. Banks*, *supra*, 59 Cal.4th at p. 1208 [“ ‘[T]he death penalty as applied in this state is not rendered unconstitutional through operation of international laws and treaties.’ ”].)

## IV. RESTITUTION FINE

Wall argues that we ought to strike or stay the imposition of a $10,000 restitution fine. Wall alleges the fine was illegally imposed in two respects: First, the trial court failed to consider Wall’s ability to pay, and second, the trial court

31

imposed the fine in violation of *Apprendi*. We conclude that Wall is correct that remand for reconsideration of the fine is required, but that *Apprendi* does not require that a jury make this determination.

Wall committed the relevant offenses on March 1, 1992. At that time, section 1202.4, subdivision (a) mandated the imposition of a restitution fine "regardless of the defendant's present ability to pay" (Stats. 1990, ch. 45, § 4, p. 261), subject to the range identified in Government Code section 13967, subdivision (a) (Stats. 1991, ch. 657, § 1, p. 3020 ["[I]f the person is convicted of one or more felony offenses, the court shall impose a separate and additional restitution fine of not less than one hundred dollars ($100) and not more than ten thousand dollars ($10,000)."]). In September 1992, the Legislature amended Government Code section 13967, subdivision (a), noting that imposition of a fine within the range identified by that statute should be "subject to the defendant's ability to pay." (Stats. 1992, ch. 682, § 4, p. 2922.) This provision was later repealed, but the restitution provisions in section 1202.4 in effect at the time of Wall's sentencing on January 30, 1995 provided that in imposing a restitution fine, "the court shall consider any relevant factors including, but not limited to, the defendant's ability to pay." (Stats. 1994, ch. 1106, § 3, pp. 6548–6549; § 1202.4, subd. (d).) Nevertheless, in imposing the maximum $10,000 restitution fine, the trial court commented: "That will be the — it's mandatory under Government Code section 13967. For whatever it's worth, he will be ordered to pay restitution in the amount of ten thousand dollars forthwith or as provided in Penal Code section 2085.5." The trial court evidently assumed it had no discretion to consider Wall's ability to pay and thus failed to properly make a discretionary restitution determination.

The Attorney General contends that Wall forfeited his challenge to this legal error, citing *People v. Avila* (2009) 46 Cal.4th 680, 729. In that case, we

found the defendant's restitution claim forfeited because when Avila was sentenced in 1999, "former section 1202.4 contained language regarding a trial court's consideration of the defendant's ability to pay." (*Ibid.*; see *People v. Gamache* (2010) 48 Cal.4th 347, 409 [finding restitution claim forfeited, since the relevant statutes at the time of both the offense and sentencing allowed the court to consider the defendant's ability to pay, and court was silent as to ability to pay]; *People v. Williams* (2015) 61 Cal.4th 1244, 1291 [same].) It is true that Wall did not object to imposition of his restitution fine and that under *People v. Scott* (1994) 9 Cal.4th 331 (*Scott*), a defendant forfeits on appeal any "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" in the absence of objection below. (*Id.* at p. 353; see *Avila*, at p. 729 [applying *Scott*'s forfeiture rule]; *People v. Smith* (2001) 24 Cal.4th 849, 852–854 [reviewing the *Scott* rule in the context of restitution and parole revocation fines]; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–889 [reviewing the *Scott* rule in the context of a vagueness challenge to a probation condition].)

But *Scott* "does not apply to cases in which the sentencing hearing was held before [the] decision [became] final." (*Scott*, *supra*, 9 Cal.4th at p. 358.) Before *Scott*, "the clear weight of authority had broadly held or assumed that errors in the court's sentencing choices and statement of reasons could not be waived." (*Id.* at 357.) Wall's sentencing hearing was conducted on January 30, 1995, before *Scott* became final on March 14, 1995. Therefore, notwithstanding the forfeiture rule stated in *Scott* and applied in *Avila*, Wall's claim that the trial court made a legal error in its decision to impose the maximum restitution fine was not forfeited by his failure to object at sentencing.

Because the trial court applied the wrong statute in imposing Wall's restitution fine, Wall is entitled to remand for reconsideration of his restitution fine under section 1202.4, the currently applicable statute. (See *People v. Covarrubias*

33

(2016) 1 Cal.5th 838, 935; *People v. Richardson* (2008) 43 Cal.4th 959, 1038; *People v. Vieira* (2005) 35 Cal.4th 264, 305–306.)

Yet that reconsideration need not be undertaken by a jury. Wall argues that because section 1202.4, subdivision (b) currently provides that the court "shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so," the absence or existence of "compelling and extraordinary circumstances" is a question of fact that potentially increases the penalty a defendant faces and therefore must be found by a jury under *Apprendi*, *supra*, 530 U.S. 466. *Apprendi* defines a "sentencing factor" as a "circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense," and distinguishes it from a "sentence enhancement," which it defines as "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict" that is "an increase beyond the maximum authorized statutory sentence." (*Apprendi*, *supra*, 530 U.S. at p. 494, fn. 19.) Because the "compelling and extraordinary circumstances" provision in section 1202.4 is phrased as a possible exemption from the trial court's otherwise mandatory duty to impose a restitution fine, the fine is properly understood as part of the maximum penalty statutorily authorized by a jury's finding that the defendant is guilty of a felony.

Finally, if the Attorney General chooses not to contest the question of restitution on remand, he should so inform the trial court in writing with notice to Wall. In that event, the court shall reduce Wall's restitution fine to $100, the statutory minimum at the time of his crime, and no hearing will be necessary. (*People v. Covarrubias*, *supra*, 1 Cal.5th at pp. 935–936 [reducing defendant's restitution fine to statutory minimum if uncontested by the Attorney General]; *People v. Souza* (2012) 54 Cal.4th 90, 143 [increased restitution fine from the

minimum at the time of the defendant's crime "constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions"].)

## CONCLUSION

We remand to the trial court for reconsideration of the defendant's restitution fine.  In all other respects, we affirm the judgment.


**LIU, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**LAVIN, J.**\*

---

\*      Associate Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Wall

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S044693
**Date Filed:** November 13, 2017

_____

**Court:** Superior
**County:** San Diego
**Judge:** Bernard E. Revak*

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Andrea G. Asaro, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

*Retired judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrea G. Asaro
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA  94607
(510) 267-3300

Teresa Torreblanca
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2279

2