Filed 8/31/20  P. v. Alcala CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAUL ALCALA,<br><br>    Defendant and Appellant. | E071190<br><br>(Super.Ct.No. RIF1402440)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

The petition for rehearing filed on August 18, 2020 is denied.  The opinion filed in this matter on August 12, 2020, is modified as follows:

1.  On page 11, after the first full paragraph, add the following footnote 8:

> **8**    At oral argument and in a petition for rehearing, defendant attempted to clarify this argument.  He claimed he was arguing that the fingerprint on the beer can showed that "Franco's version of events did not account for physical evidence found at the scene and was therefore relevant to his credibility."  This argument was not made at trial and was therefore forfeited.
>
> In any event, Franco was never asked to name everyone who was at the party and could hardly be expected to do so.  Thus, the presence of Arroyo's fingerprint on the beer can did not reflect on Franco's credibility.  Perhaps defendant means that Franco concealed the fact that Arroyo

1

accompanied him to the party; but if so, as we discuss below, the inference that Arroyo did accompany him was purely speculative.

2. On page 14, at the end of the second full paragraph, add:

Admitting the words "Tiny Weenies" would not have clarified Franco's response.

3. On page 14, at the end of the last paragraph, delete:

Arguably the trial court could have ruled otherwise, but it did not abuse its discretion.

And add this new paragraph:

While the trial court incorrectly excluded the friend's statement as hearsay, its comment that "it's there to show [the friend's] hatred or animosity towards that group" shows that it could and would have excluded the statement in any event under Evidence Code section 352. Moreover, the exclusion of the statement was harmless because all that mattered was that the friend was referring to the Tiny Winos.

4. On page 17, renumber footnote 8 as footnote 9.

5. On page 19, after "III," add:

CUMULATIVE PREJUDICE

Defendant asks us, to the extent that we find more than one error, we assess their cumulative prejudice.

In part II.C.2, *ante*, we held that the trial court erred by excluding the reference to "Tiny Weenies" on hearsay grounds, but that it could and would have excluded this evidence anyway; and moreover, this reference added nothing of significance to what was already in evidence.

In part II.D.2, *ante*, we held that the trial court erred by excluding Dr. Trenkle's opinion that the arm/back wound was consistent with a shooter other than defendant standing to the victim's left. However, we also held that the error was harmless because it was obvious that the shot was fired from the victim's left.

2

These two errors were not mutually reinforcing or synergistic in any way.  Each was harmless individually, and for the same reasons, they were harmless cumulatively.

IV

Except for these modifications, the opinion remains unchanged.  This modification does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ                        
                                                P. J.

We concur:

FIELDS                        
                              J.

RAPHAEL                        
                              J.

See attached mailing list:

MAILING LIST FOR CASE: E071190
The People v. Raul Alcala


Superior Court Clerk
Riverside County
P.O. Box 431 - Appeals
Riverside, CA 92502


Paige Boulton Hazard
Office of the State Attorney General
P.O. Box 85266
San Diego, CA 92186-5266


Arthur B. Martin
Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA 92101


Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA  92101 2396

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071190 |
| v. | (Super.Ct.No. RIF1402440) |
| RAUL ALCALA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge. Affirmed.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Steve Oetting, Warren Williams, and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

A group of people, including a number of young Hispanic men, were hanging out at a house in the territory of the Tiny Winos gang.  One of the young Hispanic men was

1

shot twice. He survived, but he claimed he did not remember the shooting. Only one of the people at the gathering was willing to talk to the police, and then only after his mother persuaded him. That person — Justin Franco — identified defendant Raul Alcala as the shooter. Defendant was a member of the Tiny Winos. Franco testified that defendant challenged the victim to fight because he felt the victim had disrespected him; after an inconclusive fistfight, defendant pulled out a gun and shot the victim.

In a jury trial, defendant was found guilty of premeditated and deliberate attempted murder (§§ 187, subd. (a), 664),[1] with an enhancement for personally and intentionally discharging a firearm causing great bodily injury (§ 12022.53, subd. (d)) and a gang enhancement (§ 186.22, subd. (b)(1)(C)). He was sentenced to a total of 40 years to life in prison.

Defendant contends that the trial court erred by excluding three items of evidence. As to two of those items, the trial court did not err. As to the third, it did err, but the error was not prejudicial. Hence, we will affirm.

I

STATEMENT OF FACTS

A.      *Prosecution Evidence*.

The shooting occurred at a house on Firebird Drive in Riverside. Victim Michael Romero lived two houses west, across the street.

---

[1]      These and all further statutory citations are to the Penal Code, unless otherwise specified.

Justin Franco[2] testified that he and Romero were friends. On the night of June 20-21, 2014, about 15 people, including Franco and Romero, were gathered in front of the house. Defendant's cousin Jimmy Gonzalez introduced defendant to Franco and Romero.

"[N]ot too long after that," defendant and Romero started arguing. Defendant "seemed to be the aggressor." He walked toward Romero and said, "He's disrespecting me." Romero seemed confused; he "back[ed] up slowly." Defendant said he was from the Tiny Winos.

Defendant said he wanted to fight Romero. He took off his shirt, revealing a black tank top underneath. They both went out into the street, then started fighting. At one point, defendant fell, and Romero fell on top of him. Bystanders pulled Romero up; Romero let defendant stand back up, too. Defendant reached into his pocket, but bystanders protested, saying "It's a one-on-one fight."

They fought again for about 15 or 20 seconds. They had stopped fighting and were standing about five feet apart when defendant pulled a gun out of his pocket and shot Romero.

The first shot hit Romero in the left arm and exited through his rear left shoulder. He grabbed his arm and fell to the ground, on his back. Defendant stepped forward,

---

**2** Franco admitted a prior juvenile adjudication for residential burglary.

3

stood over him, and shot him again, hitting him in the front of the neck.[3] Defendant ran away.

Franco called 911, reported the shooting, and then hung up. He left before the police arrived. He did not contact the police because doing so is "kind of looked down upon in the neighborhood."

Another 911 caller saw the shooter running away and described him as Hispanic, five feet nine inches tall, with a medium build, in his late 20s, and bald with a "big circle tattoo" on his back. Apparently defendant was five feet five inches tall and not totally bald; he had a tattoo of a modified, S-shaped version of the Riverside "raincross" bell on his back.

When the police arrived, a number of young Hispanic men were milling around in front of the house. They said they were friends of the victim, but they refused to identify themselves or to say anything more. They all seemed to be looking at one man for permission to speak, which he never gave.

The police were not allowed onto the property. They did not demand anyone's identification. They also did not test anyone for gunshot residue.

---

[3] Franco told police that he did not actually see defendant pull out the gun because he was distracted by two other people who were arguing and seemingly about to fight. He also told police he could not see the gun itself, but he did see the muzzle flash of the second shot.

Finally, Franco told police that he thought the first shot hit Romero in the neck, because he did not think being shot in the arm would have caused Romero to fall, and because Romero "looked like he was holding his chest" when he fell.

Romero could hardly talk. At the scene, he did tell the police he was on his way home when he was shot. At the hospital, he also told them he did not know who shot him and there had been no argument. His blood alcohol level was 0.268.

About three houses east, in the direction the shooter had run, the police found a black tank top. It had DNA from at least three people — defendant, one Jose Gonzalez,[4] and a third person who did not leave enough DNA to be identifiable.

Meanwhile, Franco checked Jimmy Gonzalez's Instagram account and found a photo of defendant, identified as "Raul 113." Franco's mother gave his phone number to the police, and they contacted him. Thus, three days after the shooting, the police interviewed Franco. He showed them the Instagram photo. Searching a gang database for members of the Tiny Winos named Raul produced defendant's name. The police prepared a photo lineup that included defendant. Franco then identified defendant's photo.

On July 10, 2014, the police searched defendant's apartment. That night, defendant did not come home from work and did not return his mother's phone calls; he also failed to drive her to work the next morning. He was arrested later that day.

Franco admitted that in December 2016, in response to a Facebook post about the Tiny Winos, he said, "Fuck 'em."

---

[4]    Gonzalez's DNA profile was found in a database. There was no other evidence about him.

Romero survived, but he claimed to have no recollection of anything that happened after he left his house, including the shooting. He denied being affiliated with any gang.

In 2010, Romero had been in a fistfight with a member of the Tiny Winos. Later that day, somebody shot at the closed door of a garage while Romero was inside, wounding him.

Detective David Riedeman was the prosecution's primary gang expert. He testified that defendant was an active member of the Tiny Winos.[5] The Tiny Winos are a Hispanic gang in Riverside. Their main rival is Arlanza 13.

As of 2014, the Tiny Winos had 30 to 35 members and associates. They have common signs or symbols, including "TW," "TW13," and Washington Nationals attire. Their primary activities are attempted murder, assault, robbery, and unlawful possession of firearms. Eight predicate offenses were established.[6]

In Riedeman's opinion, the shooting was committed for the benefit of the Tiny Winos. He explained that it bolstered the gang's reputation and caused others to fear and respect the gang. He noted that the crime was committed in Tiny Winos territory, that

---

[5]     In opening statement, defense counsel conceded that defendant was a member of the Tiny Winos.

[6]     Exhibits regarding the predicate offenses were admitted, but have not been transmitted to us. Accordingly, if and to the extent that the reporter's transcript, standing alone, does not provide sufficient evidence of the predicate offenses, we presume that the exhibits made up the deficit.

defendant said the victim had disrespected him, and that defendant claimed "Tiny Winos."

B.      *Defense Evidence*.

Dr. Steven Trenkle, an expert forensic pathologist, testified that normally an entrance wound is abraded and an exit wound is not. However, an exit wound may be abraded when it is "shored" — i.e., when the skin is being supported, as by a bra strap, a chair, or the ground.

Here, the victim's arm and back wound were both abraded. Dr. Trenkle therefore did not know which was the entrance and which was the exit. Assuming, however, the back wound was the exit, then the victim must have been lying flat on his back at the time. The shoring was inconsistent with the shot being fired while the victim was standing up. It was also inconsistent with the shot being fired while the victim was sitting up or lying on his side.

Moreover, the trajectory of the arm/back shot was from the left front to right rear; thus, it was inconsistent with the shooter standing over the victim while the victim was on his back.

William Matty, an expert criminalist specializing in firearms, had examined the victim's shirt and jacket. The shape of the bullet holes in the jacket was "most consistent" with the arm wound being an entrance wound and the back wound being an exit wound.

Matty also testified that there was no gunshot residue on the shirt or the jacket. If someone shot the victim while standing over him, there would have been some gunshot residue.

## II

## EXCLUSION OF EVIDENCE

### A.     *Standard of Review*.

"A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice. [Citation.]" (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.)

### B.     *Evidence of a Fingerprint on a Beer Can*.

Defendant contends that the trial court erred by precluding him from asking about a fingerprint found on a beer can at the scene of the shooting.

#### 1.     *Additional factual and procedural background*.

At the scene of the shooting, the police found a Budweiser beer can. It was tested for fingerprints. Between the scene and Romero's house, there were three more Budweiser cans, which they did not collect. There were two more beer cans (brand not stated) outside the Hernandez house, which they also did not collect.

The prosecution moved in limine to exclude any evidence that one Jesse Arroyo was the shooter, as improper evidence of third-party culpability. It conceded that

Arroyo's fingerprint was found on the Budweiser can and that Arroyo was an associate of the Arlanza 13 gang.

Defense counsel responded that he was not offering the fingerprint as third-party culpability evidence. The prosecution then further objected that this evidence was irrelevant. Defense counsel argued that the evidence was relevant for four purposes:

1. To show that the police did an inadequate investigation by failing to interview Arroyo and by failing to recover and test the other beer cans that were at the scene.

2. To show that witnesses may have been reluctant to talk to the police, not because they were afraid of the Tiny Winos, but because they were afraid of (or they were members of) Arlanza 13.

3. To show that multiple people were fighting, not just defendant and Romero, and that this distracted Franco.

4. To show that a member of Arlanza 13 was present and could have been the shooter, but only if the People opened the door by arguing that, if defendant was not the shooter, the only gang members present were Tiny Winos, and therefore some other member of the Tiny Winos must have been the shooter.[7]

The trial court excluded the evidence. It found that the fact that the police did not interview Arroyo was only "minimal[ly]" relevant, in the absence of other evidence that Arroyo was the shooter. It observed that defense counsel could still bring out the fact

---

[7] While defense counsel disclaimed any intention of presenting the fingerprint as third-party culpability evidence, this last rationale sure sounds like it.

that the police did not collect other evidence at the scene, that "everyone clammed up," and that other people were arguing or fighting. However, it offered to reconsider if the prosecution did argue that only Tiny Winos were present.

Defense counsel then argued that there was a "trail" of beer cans between Romero's house and the shooting scene; thus, the fingerprint tended to show that Arroyo accompanied Romero, and that they both intended to cause trouble with the Tiny Winos.

The trial court responded, "[A]ssuming [Arroyo]'s there . . . , I haven't heard anything from you indicating that he's the provoker . . . . The mere fact of his presence, . . . I don't see why it's relevant."

During the trial, defense counsel asked several more times to introduce evidence regarding the fingerprint, but the trial court adhered to its ruling.

### 2. *Discussion.*

As in the trial court, defendant does not argue that the fingerprint was admissible as evidence of third-party culpability. Rather, he argues that it was admissible for two other reasons.

First, he argues that the fingerprint was relevant to show that the police did an inadequate investigation. As the trial court ruled, it was minimally relevant to show that the police never interviewed Arroyo. However, defense counsel did not offer to prove that the police would have learned anything from him; everyone at the party (other than Franco) refused to talk to the police. Other evidence of an inadequate investigation did come in, including that that the police saw other beer cans but failed to collect them.

10

Most important, the fingerprint was significantly likely to confuse the jurors, by inviting them to speculate, despite the absence of any proper third-party culpability evidence, that Arroyo was the shooter. (See Evid. Code, § 352.)

Defendant's second argument is vague. As we understand it, however, it is that the fingerprint was relevant to show that Romero went to the party with Arroyo, who was an Arlanza 13 associate, and therefore that Romero intended to cause trouble. If he is arguing something different, then defense counsel forfeited it by not raising it below. (Evid. Code, § 354, subd. (a).)

There was already some evidence that Romero intended to cause trouble — he had a grudge against the Tiny Winos, and he said or did something that defendant, at least, considered disrespectful. Romero's intent, however, is not exculpatory. Even if Romero insulted defendant, that would not justify defendant in shooting him. Indeed, the jury heard that Romero accepted defendant's challenge and joined in a physical fight with him; that still did not justify defendant in shooting him. Evidence that Romero arrived with an Arlanza 13 associate would have added nothing significant to this evidence.

Moreover, to reason from the fingerprint to the conclusion that Romero intended to cause trouble is doubly speculative.

The inference that Arroyo accompanied Romero was speculative, because there was no evidence that the Budweiser cans near Romero's house belonged to anyone in his group. Franco told police that Budweiser was served at the gathering before the shooting. Romero, for his part, denied even knowing Arroyo.

And even assuming Arroyo did accompany Romero, the inference that Romero intended to cause trouble is speculative. Romero denied ever hearing of a gang called Arlanza 13.

As defendant points out, Romero's denial was not entirely credible. He testified that he had lived in the Arlanza area of Riverside since he was in sixth grade. A gang expert testified that it was "[n]ot likely" that a person in Romero's situation would not have heard of Arlanza 13. However, even if the jury found that this denial was false, it would be too much of a leap to conclude that Romero teamed up with an Arlanza 13 associate to cause trouble.

And, we repeat, the fingerprint was significantly likely to confuse the jurors.

"'The trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence.' [Citation.]" (*People v. Sanchez* (2019) 7 Cal.5th 14, 54.) Defendant has not shown an abuse of that discretion.

C. *Evidence That Franco's Friends Referred to the "Tiny Weenies."*

Defendant contends that the trial court erred by excluding evidence that Franco's friends referred to the Tiny Winos as the "Tiny Weenies."

1. *Additional factual and procedural background.*

During the cross-examination of Franco, there was this exchange:

12

"Q. You and your friends, when you talk on social media, do you refer to the Tiny Winos as the Tiny Weenies?

"[PROSECUTOR]: Again, your Honor, hearsay.

"THE COURT: Well, as to him —

"[PROSECUTOR]: Yes.

"THE COURT: — only. As to his friends, it would be sustained as to hearsay.

"So if you want to limit the question as to just Mr. Franco."

This exchange then followed:

"Q. Okay. But . . . in referring to the Tiny Winos, you responded to your friend and you said, 'Fuck 'em.' right?

"A. Yes.

"Q. And you meant fuck 'em meaning the Tiny Winos. Correct? [¶] . . . [¶] . . .

"[A.] I don't recall what I meant at the time."

At the next break, defense counsel asked the trial court to reconsider its ruling. He argued: "The entirety of that conversation is non-assertive. We're not trying to establish any fact as stated within those. But the actual conversation themselves would be non-assertive operative fact, which would not be hearsay."

The trial court adhered to its ruling. It explained: "[T]here's two problems. The first is it's hearsay, and we don't know who it is that said those things . . . . And then secondly, it is being offered for the truth of the matter because it's there to show a particular hatred or animosity towards that group."

13

2.    *Discussion.*

The friend's statement, if offered to prove that Tiny Winos actually had tiny weenies, would be hearsay. Moreover, it implied an assertion that the speaker disliked Tiny Winos. If offered to prove that implied assertion, it was also hearsay (see *People v. Morgan* (2005) 125 Cal.App.4th 935, 942-946), but it would be potentially admissible under the state of mind exception. (Evid. Code, § 1250, subd. (a)(1).)

The state of mind of Franco's friend, however, was irrelevant. What was relevant was Franco's own state of mind. Accordingly, as defense counsel argued, the friend's side of the conversation was admissible for the nonhearsay purpose of giving Franco's reply — "Fuck 'em" — its true meaning in context. (See *People v. Morgan*, *supra*, 125 Cal.App.4th at pp. 942-943.)

But here's the rub: To place Franco's reply in context, all that was necessary to show was that his friend said something *about* the *Tiny Winos*. It was not necessary to show *specifically* that he called them *Tiny Weenies*. If that evidence had been admitted, it would have invited the jury to speculate about Franco's friend's state of mind, which was irrelevant — or even to speculate that Franco shared his friend's state of mind. Franco did not unequivocally agree with his friend; rather, he said, "Fuck 'em," which could be interpreted as not wanting to talk about them, or as not caring what his friend called them.

Further questioning made it clear that the friend was "referring to the Tiny Winos." This was sufficient to place Franco's reply in context. Arguably the trial court could have ruled otherwise, but it did not abuse its discretion.

14

Defendant argues, "Without evidence of the 'Tiny Weenies' comment Franco was responding to, Franco was able to claim he did not remember what he meant . . . ." This does not follow. Again, all that matters is that Franco was responding to a comment about the Tiny Winos. The jury could infer that he was insulting them, even if he claimed he did not remember. And even if the reference to Tiny Weenies had come in, Franco still could have claimed he did not remember what he meant.

D.      *Evidence That the Victim May Have Been Shot by Someone to His Left*.

Defendant contends that the trial court erred by precluding him from asking an expert whether the victim's wounds were consistent with a shooter standing to his left.

1.      *Additional factual and procedural background*.

During the direct examination of Dr. Trenkle, there was this exchange regarding the victim's arm/back wounds:

"Q. If the victim is lying on his back and the alleged shooter is standing at his feet, would this bullet wound be consistent with somebody else who is watching the fight shooting at these two if they are off to the left?

"[PROSECUTOR]: Objection, Your Honor. Improper hypothetical.

"THE COURT: Sustained.

"Q. . . . Is it consistent that someone standing watching the fight shooting into this, that trajectory would be consistent?

"[PROSECUTOR]: Same objection.

"THE COURT: Sustained.

15

"Q. . . . If the alleged shooter, as described, is at the feet of Mr. — or the shooting victim has a shot on his left arm, is that consistent with another party possibly shooting that direction?

"[PROSECUTOR]: Same objection.

"THE COURT: Sustained."

In a sidebar discussion, the trial court ruled there was no evidence to support the hypothetical questions — i.e., no evidence that there was "a second shooter."

Defense counsel then argued that Dr. Trenkle's testimony meant the bullet that caused the arm/back wounds could not have been fired from where Franco claimed defendant was standing. The trial court ruled again that "there has to be some evidence that there is a second shooter," and there is no "evidence of a second shot from another direction, whether it be from down the street or a grassy knoll . . . ."

2.      *Discussion*.

"An expert opinion may be rendered in the form of responses to hypothetical questions that ask the expert to assume the truth of certain facts rooted in the evidence. [Citations.] But 'the expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors."' [Citations.]" (*People v. Flores* (2020) 9 Cal.5th 371, 398.)

Here, the only assumptions in defense counsel's questions were that "the victim is lying on his back," "the alleged shooter is standing at his feet," and the victim had the bullet wound that he did in his left arm and back. There was ample evidence of each of

16

these assumptions.  The questions then asked the expert whether they were consistent with a shooter other than defendant, standing off to the victim's left.**8**  In other words, the hypothetical did not ask the expert to *assume* a shot from the left; it asked whether facts *already in evidence* were consistent with a shot from the left.

Thus, the trial court erred.  We turn to whether the error was prejudicial.

"'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' [Citation.]  Because the trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense, any error is one of state law . . . . [Citation.]" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.)  Thus, the error does not require reversal unless there is a reasonable probability that, if the evidence had been admitted, defendant would have enjoyed a more favorable outcome.  (*Ibid.*; see generally Cal. Const., art. VI, § 13; Evid. Code, § 354.)

Defendant argues that the error was prejudicial because Franco was the only percipient witness, and therefore raising doubt about Franco's testimony was crucial to the defense.  However, defendant did raise doubt on this point.

---

**8**　　The questions did not literally ask about "a second shooter."  The presence of a second shooter would not be a defense; even if defendant fired only the shot to the neck, he would still be guilty of attempted murder.

Rather, the questions asked whether the arm/back shot could have been fired by a person other than defendant.  That might raise a reasonable doubt as to whether defendant fired *any* of the shots.

Dr. Trenkle made it clear that the arm/back shot traveled from the victim's left front to his right rear. He even demonstrated this, using a trajectory rod while defense counsel lay on the floor of the well. Even without his expert opinion and his demonstration, it would have been obvious to the jury that the shooter was somewhere to the victim's left.

Based on the shoring, Dr. Trenkle also testified that the victim was lying flat on his back, not lying on his side or standing up, when the shot was fired. He concluded that Franco's testimony — that the victim was lying on his back and defendant was standing over him — was inconsistent with the physical evidence. Matty cast further doubt on Franco's testimony by testifying that, if it was correct, there should have been gunshot residue on the victim.

In closing argument, defense counsel reviewed Dr. Trenkle's testimony, including that the trajectory of the arm/back shot was inconsistent with Franco's account. He specifically argued that that shot came from the victim's left.

In sum, then, Dr. Trenkle's testimony was sufficient to raise doubt about Franco's account. The only thing missing was testimony *drawing the conclusion* that the physical evidence was consistent with a shooter off to Franco's left. Again, however, this would have been obvious to the jurors. The defense did not need to establish exactly how the shooting occurred; it only had to show that the shooting might not have occurred the way Franco described it. Despite the trial court's error, it was able to accomplish this. Evidently the jury simply was not convinced.

18

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ               
P. J.


We concur:

FIELDS            
J.

RAPHAEL          
J.