Filed 2/16/21  P. v. Jaime CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
### SECOND APPELLATE DISTRICT
### DIVISION FOUR

THE PEOPLE,

    Plaintiff and Respondent,

v.

MARK JAIME,

    Defendant and Appellant.

B303522

Los Angeles County
Super. Ct. No. KA118816

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge. Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Attorney General, Jaime L. Fuster and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant and appellant Mark Jaime of four sex offenses for molesting his daughter over a period of several years. The trial court sentenced him to 38 years to life in state prison. On appeal, Jaime raises three arguments: (1) statements he made during a police interview were inadmissible because he was in custody and not given *Miranda*[1] warnings; (2) the statements were inadmissible because they were involuntary; and (3) the trial court prejudicially erred by giving a modified version of the flight instruction. We affirm.

# PROCEDURAL BACKGROUND

The Los Angeles County District Attorney filed an amended information charging Jaime with two counts of oral copulation or sexual penetration with a child 10 years old or younger (Pen. Code,[2] § 288.7, subd. (b); counts one and four), one count of lewd conduct upon a child under the age of 14 (§ 288, subd. (a); count two), one count of forcible oral copulation (§ 288a, subdivision (c)(2)(A); count three),[3] and one count of oral copulation (§ 288a, subdivision (b)(1); count five).[4] The jury found Jaime guilty on counts one, two, four, and five. The trial court's sentence of 38

---

1    *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

2    All further undesignated statutory references are to the Penal Code.

3    Effective January 1, 2019, setion 288a was renumbered as section 287.

4    The trial court later granted Jaime's motion for judgment of acquittal on count three under section 1118.1.

years to life in state prison was calculated as follows: two consecutive terms of 15 years to life on counts one and four, a consecutive upper term of eight years on count two, and a concurrent term of three years on count five. Jaime timely appealed.

## FACTUAL BACKGROUND

### I.      Prosecution case

Jaime's daughter M.J. testified Jaime molested her from the time she was eight years old until she was 17 years old. When Jaime first molested her, their family lived in a two-bedroom apartment in West Covina. Jaime called her into a room, told her to take off her pants, touched her vagina, and ordered her to touch her vagina. Later, he would show her how to masturbate, explain why she should do so, and occasionally ask her how often she would masturbate. Jaime molested M.J. "a few times a month" from the time she was eight years old until she was 13 or 15. Similar activity, along with acts of oral copulation and penetration, continued "a few times every month" until M.J. was 13 or 14 years old. Jaime would orally copulate M.J., and she would orally copulate him. These activites would begin with Jaime asking M.J. if she wanted to "play." M.J. felt obligated to say yes because Jaime was her father. Jaime cautioned M.J. that if she told anyone about what was happening it would tear their family apart.

When M.J. was 11 or 12 years old, the family moved to a three-bedroom apartment in West Covina where she had her own bedroom. Around this time, Jaime came into her room to "play"

3

and told her he wanted to do something different. He told her what he wanted would only hurt for a little bit, then he inserted his penis into her vagina. This may have also occurred on one other occasion.

Once M.J. was about 12 or 13, she began to speak up and tell Jaime she no longer wanted to "play." In response, Jaime berated her, withheld privileges, and frequently lectured her for hours on end. M.J. would often stay away from the house and hang out with friends to avoid contact with Jaime.

When M.J. was a senior in high school and 17 years old, she lost her cell phone. When she asked Jaime to replace it, he replied, "[w]hat's in it for me?" M.J. understood the question to be a request for sex. Jaime told her to take off her shirt, touched her breasts, and told her to take off her pants and go to the bedroom. Inside the bedroom, he grabbed her breasts and orally copulated her. Immediately after the incident, M.J. swabbed her vagina with a Q-tip and put the sample in a plastic bag; she was afraid no one would believe her without evidence. Having the sample gave her confidence to reveal her father's abuse to others.

A few weeks later, and while experiencing serious health issues she attributed to her father's abuse, M.J. decided to tell her mother and brother what had happened. That day, the entire family, including Jaime, drove together to the police station, where M.J. turned the Q-tip swab over to West Covina Police Officer Joseph Melnyk.

A Los Angeles County Criminalist analyzed the Q-tip, and concluded both M.J. and Jaime's DNA were present, though she could not determine whether Jaime's DNA on the swab came from sperm cells.

M.J.'s older brother G.J. testified regarding M.J.'s revelation of Jaime's abuse. When G.J. confronted Jaime about M.J.'s accusations, Jaime's response was "I'm not going to say yes or no, but that's not exactly what happened." Later that day, Jaime admitted he engaged in oral sex with M.J. once a few months earlier, but denied that there had been any penetration. That same day, G.J. spoke to the police and related his father's admission.

At about 4:30 p.m. on August 9, 2018, Officer Melnyk was called to the lobby of the West Covina Police Department to meet Jaime's family. Jaime told Officer Melnyk that M.J. wanted to speak with him, and "whatever she says is what happened." Officer Melnyk escorted M.J. to an interview room, where they discussed the matter for at least an hour. During their conversation, M.J. gave him a resealable bag containing a Q-tip, which he booked into evidence. Officer Melnyk also spoke with M.J.'s mother, then contacted West Covina Police Detectives Pedraza and Pruitt, who worked on sexual assault cases.

Detectives Pedraza and Pruitt recorded an interview with Jamie, and the interview was played for the jury at trial.Detective Pedraza first asked, "Hey, Mark, what do you think about what's going on here? What are your thoughts?" Jaime replied, "[m]m you pulled in my daughter and she talked to you guys." When Detective Pedraza pressed Jaime on why he would do the things M.J. had accused him of doing, Jaime responded, "All I know is that um my family – my daughter she is in pain. I'm fine. I have nothing to say." Detective Pedraza said, "You're ok with your daughter being in pain? You don't want her to feel better?" Jaime replied, "No, whatever she wants to say happened, happened. That's up to her." Jaime also said,

"Whatever she said is ok, and I'll go," "I surrender myself," and "Take me."

When Detective Pedraza continued, "[S]he's saying you guys had sex," Jaime said, "I don't know man. You're . . . presenting me with some type of narrative and I'm going ok, I don't know. Whatever she wants, that's fine." Jaime also said, "All I'm saying is that all – you have all the answers. She gave them to you." Jaime later added, "[I]t doesn't matter what she said. I'm ready to accept any type of punishment." The interview concluded with Jaime being arrested for forcible oral sex and intercourse with M.J.

## II.    Defense case

Jaime testified in his defense as follows. He denied M.J.'s accusations of sexual misconduct. He also denied telling her he would only buy her a new phone if she engaged in sexual activity with him. Five or six days before the family went to the police, Jaime and his wife argued with M.J. because she got tattoos. The tattoos, he said, were indicative of M.J.'s defiance of her parents over the years. Jaime threatened to throw M.J. out of the house and not send her to college if she continued her defiance.

That same day, M.J. spoke with her mother. The next day, M.J.'s mother took M.J. to stay with her aunt. Before going to the police, M.J. told Jaime she would not go to the police if he left the house. Jaime denied admitting to his family that he engaged in sexual misconduct with M.J. He went to the police because he did not want to further disrupt the family.

Jaime provided further testimony regarding M.J.'s request for $300 for a new phone. He claimed that when he explained

6

why he would not give her the money, she voluntariy exposed herself to him and offered to repay him sexually. He refused her offer and told her to leave. Later that day, Jaime gave M.J. the money for the phone and asked her to go into his bedroom so he could give her a lecture. M.J. went into the bedroom, took off her clothes, laid down in the bed, and offered herself to him in return for the money for the phone. Although Jaime was shocked by her behavior, he felt he needed to placate her and get her out of the room, so he kissed her inner thigh, which explained why his DNA was on the swab she gave to the police, although they had no sexual contact.

Jaime agreed to go to the police because he felt that he had failed his family and because he recently lost his mother. Those were the reasons he told officers, "[w]hatever my daughter says, that's true." He believed M.J. falsely accused him as retaliation for his past efforts to discipline her. Jaime ingested alcohol and marijuana before going to the police station.

### III. Prosecution rebuttal

Detective Pedraza testified that, based on his training and experience, he did not believe Jaime was under the influence of alcohol or drugs during his August 9 interview.

## DISCUSSION

### I. Jaime's *Miranda* argument

Jaime contends the trial court prejudicially erred by admitting statements he made to the police during a custodial interrogation without being advised of his *Miranda* rights. The

7

Attorney General argues Jaime has forfeited his argument by not objecting below, that even assuming the argument was not forfeited, he was not in custody for purposes of *Miranda*, and even assuming he was in custody, any error was harmless. For the reasons discussed below, we conclude Jaime has forfeited his *Miranda* argument.

## A. Background

On August 9, 2018, Jaime's family came to the West Covina Police Department because M.J. wanted to report the sexual abuse. Officer Melnyk met Jaime's family of four (Jaime, his wife, his son, and his daughter) in the police station lobby. Before Officer Melnyk spoke with M.J., he first asked to speak with Jaime. Jaime told Officer Melnyk that "[w]hatever [M.J.] says is what happened." Officer Melnyk escorted M.J. to an interview room and spoke to her for over an hour. Detectives Pedraza and Pruitt then interviewed Jaime.

Before trial, defense counsel made a motion under Evidence Code section 402 to exclude the tape and transcript of Jaime's conversation with Detectives Pedraza and Pruitt, or alternatively, to redact the transcript. The prosecution argued Jaime's initial statement to Officer Melnyk that "everything [M.J.] says is true" was admissible because he voluntarily came to the police station and voluntarily made the statement without any show of force by the police. The prosecution argued Jaime's statements during the interview were admissible because Jaime came to the police station voluntarily and entered the interview voluntarily, and because Detectives Pedraza and Pruitt told him during the interview that he was not under arrest. Defense

counsel argued the detectives used interrogation tactics that were coercive, aggressive, and guilt-inducing, rendering the contents of the interview inadmissible.

The trial court concluded Jaime's pre-interview statement ("everything [M.J.] says is true") was admissible because Jaime came to the police station voluntarily and made the statement voluntarily. With respect to the actual interview with the detectives, the court stated as follows:

> But the whole point is, was this a custodial setting, which would otherwise require a *Miranda* warning. [Jaime] was certainly notified that he was not under arrest, and that they were simply there to follow up on these accusations, ask a few questions. And again, [Jaime's] responses were not earth-shattering[5] for purposes of the People's case, but certainly it's information that the jury should be entitled to consider, so relevan[t].

> So if there is a *Miranda* argument that the defense would like to prompt, my tentative ruling would be to deny it because, quite frankly, it wasn't a custodial situation, even if the questions could be considered interrogative in nature. In terms of relevancy, certainly adoptive admissions and the evasive behavior could show a consciousness of guilt [on the] part of the accused.

---

5    The court's comment regarding the responses not being earth-shattering was in reference to the fact that Jaime was evasive throughout the interview.

9

The court ruled the interview admissible and allowed the jury to give it whatever weight it deemed appropriate.

**B. Analysis**

The Attorney General argues Jaime has forfeited his *Miranda* argument by not objecting below on that specific ground. In his reply brief, Jaime argues the record "belies [the Attorney General's] assertion of forfeiture[,]" but points to no specific place in the record where his trial attorney objected on *Miranda* grounds or argued the interview was custodial. In our review of the record, we see no objection on *Miranda* grounds. Defense counsel argued the interview was inadmissible because the detectives' questions were coercive, but never argued Jaime was in custody for *Miranda* purposes. His *Miranda* argument is therefore forfeited. (See, e.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1166 (*Linton*) [concluding defendant forfeited *Miranda* argument on appeal by not raising it in the trial court].)[6]

Because Jaime has forfeited his *Miranda* argument, we decline to address whether his interview with Detectives Pedraza and Pruitt was a custodial interrogation. Furthermore, even assuming the interview was custodial, any error in admitting its

---

6      Although the trial court discussed its *tentative* ruling on the applicability of *Miranda* in response to the prosecution's argument that Jaime was not in custody, defense counsel never raised an objection on *Miranda* grounds or argued the interview was custodial. As a result, the theory was never fully litigated, and the facts surrounding whether the interview was custodial were not fully developed below. (See *Linton, supra*, 56 Cal.4th at p. 1166.)

contents would have been harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] (*Chapman*).) As the trial court noted, Jaime's responses during the interview "were not earth-shattering." He essentially evaded the detectives' questions and attempted to paint himself as a concerned parent and a victim of circumstances beyond his control. Furthermore, the prosecution's case against Jaime was very strong. Before the interview, Jaime voluntarily admitted to Officer Melnyk that "[w]hatever [M.J.] says is what happened." Additionally, M.J.'s testimony undoubtedly played a central role in the jury returning guilty verdicts, as did G.J.'s testimony that Jamie told him he engaged in oral sex with M.J. For these reasons, any alleged error would have been harmless.[7]

## II.    Jaime's contention that his statements were involuntary

Jaime next argues the contents of his interview with Detectives Pedraza and Pruitt were inadmissible because the statements were involuntary. The Attorney General contends the

---

7    In supplemental briefing, Jaime argues that in light of our Supreme Court's recent decision in *People v. Henderson* (2020) 9 Cal.5th 1013, his interview with the detectives should have ceased once he invoked his right to counsel. Even assuming Jaime's request for counsel rendered his subsequent statements inadmissible, the error would still have been harmless beyond a reasonable doubt based on M.J.'s testimony, G.J.'s testimony, and Jaime's voluntary inculpatory statement to Officer Melnyk (i.e., "[w]hatever [M.J.] says is what happened").

statements were voluntary, and even assuming they were not, any error was harmless. We agree with the Attorney General.

"Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial. [Citations.]" (*Linton, supra*, 56 Cal.4th at p. 1176.) "A confession is involuntary if the "'"'influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined."'"'" [Citation.]" (*People v. Wall* (2017) 3 Cal.5th 1048, 1065-1066 (*Wall*).) "'A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence.' [Citation.]" (*Id.* at p. 1066.) "However, 'no single factor is dispositive in determining voluntariness . . . rather[,] courts consider the totality of the circumstances.' [Citation.]" (*Ibid.*)

In reviewing Jaime's argument that his statements were involuntary, we "'"' . . . examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation, or threat. [Citations.] . . ."'"' (*People v. Maury* (2003) 30 Cal.4th 342, 404 (*Maury*).) "' . . . When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness. [Citation.]'" (*Ibid.*)

Applying these principles, we conclude Jaime's statements during his interview with Detectives Pedraza and Pruitt were voluntary. Nothing in the record suggests Jaime made any of the statements as a result of threats, violence, express or implied

12

promises, or any other improper influence on the part of the detectives. (See *Wall*, *supra*, 3 Cal.5th at p. 1066.) Furthermore, even assuming we were to conclude the statements were involuntary, the admission of the statements would be harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)[8]

### III.   Jaime's flight instruction argument

Jaime lastly argues the trial court's decision to provide the jury a modified flight instruction, combined with the errors he asserts in his first two arguments, prejudicially violated his right to due process. We disagree.

M.J. told Jaime that if he left the house, she would not report him to the police. Jaime responded: "You know what? I'm going to just leave," and "I can be homeless. I could go out and . . . hide from the police." Jaime testified that on the morning he went to the police station with his family, he was preparing to leave the house. He had called his brother, who was homeless, and an aunt with whom he might stay. Jaime did not end up leaving the house because he was inebriated and did not want to leave.

Based on the above evidence, the trial court proposed instructing the jury on flight using CALCRIM 372. The court explained that a modified version of the instruction was proper because Jaime's statements about leaving, becoming homeless, and hiding from the police were a threat to flee. Defense counsel objected, arguing Jaime did the opposite of fleeing by going to the

---

8      The same prejudice analysis that applies to Jaime's *Miranda* argument (see above) applies here.

13

police station. The trial court noted Jaime voluntarily went to the police, but had threatened to do something different, which was sufficient to warrant giving CALCRIM 372. The court modified CALCRIM 372 and instructed the jury as follows: "If the defendant threatened to flee immediately after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant threatened to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant threatened to flee cannot prove guilt by itself."

We need not decide whether the trial court erred by giving the modified flight instruction. Even assuming the court's use of the instruction was error, it is not reasonably probable the outcome would have been more favorable to Jaime absent the instruction. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837.) "The instruction did not assume that flight [or threat of flight] was established, but instead permitted the jury to make that factual determination and to decide what weight to accord it. [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1182-1183.) Moreover, the trial court instructed the jury using CALCRIM 200, which provided: "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Indeed, even assuming we were to conclude the giving of the instruction was error, and even if we were to also conclude the admission of Jaime's interview with Detectives Pedraza and Pruitt was error, the cumulative effect of these alleged errors would still be harmless beyond a reasonable doubt

14

based on M.J.'s testimony, G.J.'s testimony, and Jaime's statement to Officer Melnyk.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, J.

We concur:

MANELLA, P.J.

WILLHITE, J.