Filed 3/13/26  P. v. Woods CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084000 |
| v. | (Super. Ct. No. RIF2101275) |
| MARTELL WOODS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge.

Affirmed with directions.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and

Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General,

Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, and Andrew

Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Martell Woods appeals from the judgment entered following jury convictions for premeditated attempted murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a))[1] against Jane Doe A.B. (count 1) and against Jane Doe B.O. (count 2). The jury also found true allegations as to counts 1 and 2, that defendant personally discharged a firearm in the commission of the offenses. (§§ 12022.53, subd. (c), 1192.7, subd. (c)(8).) As to count 1, the jury found true the allegation of premeditation and deliberation, and found not true the allegation as to count 2. The jury further found defendant guilty of assault with a semi-automatic firearm (§ 245, subd. (b); count 3 (A.B.) and count 4 (B.O.)), and that defendant personally discharged a firearm in the commission of counts 3 and 4. (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8).) The trial court also found true the allegation that defendant committed the offenses while on bail for another offense (§ 12022.1). The trial court sentenced defendant to an aggregate sentence of 49 years plus an indeterminate sentence of life in prison.

Defendant contends the trial court violated his rights to due process and a fair trial when it denied his motion for a mistrial, which was based on the trial court allowing prejudicial evidence of uncharged acts committed by defendant that were not disclosed until one of the victims, A.B., testified at trial. Defendant did not object to the evidence until he brought his motion for new trial, but argues that even if he forfeited the issue, the

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

trial court erred in denying his motion for mistrial because his attorney committed ineffective assistance of counsel (IAC) by not timely objecting to the testimony until moving for mistrial. In addition, defendant argues the trial court erred in prohibiting testimony that the location of the shooting was in a high crime area. Defendant further argues there was cumulative error. Defendant also asserts that the trial court erred in imposing concurrent sentences on counts 3 and 4 (assault with a semi-automatic firearm), because counts 3 and 4 were based on the same acts for which defendant was sentenced on counts 1 and 2 (attempted murder).

We reject defendant's contention that there was cumulative error requiring reversal because, as stated below, we conclude the errors raised have no merit, other than the sentencing error. As to sentencing, the parties agree, as does this court, that the trial court erred in imposing concurrent sentences on counts 3 and 4, and that the sentences on counts 3 and 4 must be stayed under section 654. In all other regards, the judgment and sentence are affirmed.

## II.

### FACTS AND PROCEDURAL BACKGROUND

Defendant is A.B.'s ex-boyfriend. They dated on and off for about four years, beginning in 2016, when A.B. was 15 years old and defendant was 18 years old. During A.B.'s junior year in high school, when A.B. was 16 and defendant was 19 years old, A.B. became pregnant and miscarried. In September or October of 2020, A.B. found out

3

she was pregnant again and told defendant.  A.B. was 18 and defendant was 20 years old. She miscarried the baby after she discovered defendant had slept with another girl.

A.B. and defendant broke up in mid-2020, although they continued to periodically talk to each other.  They were intimate until the fall of 2020.  When A.B. told defendant they were breaking up, defendant told her that it "can't be done."

In November 2020, A.B. had a new boyfriend.  When defendant found out, he called her and asked if she was having sex with her new boyfriend.  A.B. said she was. Defendant "started acting out."  Defendant sent A.B. messages and videos, including photographs of her mother's house and of himself with guns.  A.B. responded that their relationship was over and that she had another boyfriend.  During cross-examination, A.B. acknowledged that some of the videos and photographs were sent to her by friends or were screenshots of photographs on defendant's social media account.  B.O. testified A.B. seemed frustrated and did not welcome defendant's messages because she wanted to move on and leave defendant in the past.  After A.B. broke up with defendant, B.O. and A.B. became good friends in 2020.[2]

---

[2]  They have not been friends since 2021, and have not spoken to each other since then.

A. *Car Wash Incident on December 6, 2020*

On December 6, 2020, A.B. drove her car to a carwash with B.O. After A.B.'s car was washed and they were about to leave the carwash, B.O. saw defendant with two females, about 20 to 30 feet away. B.O. saw defendant point a gun at her and A.B. The gun's green laser beam passed through the car for about 10 seconds. A.B. and B.O. drove away and pulled over after driving a short distance. They stopped for about five minutes to collect themselves.

As they pulled away from the curb to drive home, an oncoming car made an illegal U-turn and hit the side of A.B.'s car. A.B. and B.O. got out of the car to exchange information with the other driver, whom they realized they knew. While they were chatting, a black car drove by. The passenger's head protruded from the sunroof. The car passed by three times. B.O. recognized defendant as the passenger. He shouted to them, "'Are you scared of Telly?'" Telly is his nickname. B.O. asked him, "What's up?" and asked what he wanted. Defendant flashed his gun with the laser beam and pointed it toward them again, moving the beam all around toward the car, A.B., and B.O. as they drove past. B.O. was scared.

B.O. testified she did not call the police because she thought defendant would leave them alone, but both B.O. and A.B. also told an investigator that they intended to report the incident to the police to "'set him up.'" A video capturing B.O.'s verbal exchange with defendant as he drove by the car accident scene was played for the jury. B.O. identified the male voice in the video as defendant. Near the end of the video, a

5

hand holding a gun is shown. B.O. testified that defendant was holding the gun and pointing it at A.B. and B.O.

A.B. testified she told a sheriff's deputy that she did not know defendant was at the car wash during the December 6, 2020, incident until he texted her saying he could see her and he could help wash her car. She then looked around and saw him 40 feet away. He pointed a gun at her when she was about 20 feet away. She saw the light from his gun laser pass over her car. As soon as A.B. saw defendant with a gun, she drove off. A.B. noticed defendant was following her and recording her. He yelled and flashed a gun 40 feet from her, while in the passenger seat of the car. The green laser crossed her knees and legs twice.

B. *Prior Undisclosed Hotel Incident*

A.B. said she did not think about calling the police after defendant pointed a gun at her at the car wash on December 6, 2020, because she was not surprised defendant pulled a gun. He had done it before when they were staying at a hotel. During the hotel incident, he got mad at her, pulled a gun out from under his pillow, yelled at her, and put his hands around her neck. A.B. tried to call her mother but defendant would not let her use her phone and forced her into the bathtub with her clothes on. He did not do anything with the gun other than try to scare her. Defendant recorded on his phone forcing her into the tub while berating her and making fun of her. He eventually calmed down. A.B. did not call the police and they stayed at the hotel. The gun was different than the gun defendant used at the car wash. A.B. testified that she never told the police or any

6

investigators about the hotel incident before the trial. A.B. testified that there were no other prior incidents in which defendant pointed a gun at her, but while dating him, she saw him with four different types of guns.

C. *Shooting Incident on December 8, 2020*

On December 8, 2020, a friend told B.O. that defendant posted a video of A.B. and defendant having sex on Instagram Live. A.B. was 15 years old at the time of the video. She did not give defendant permission to make the recording and asked him to delete it, but he would not do so. A.B. and B.O. decided to drive to defendant's parents' home to talk to them about the video defendant posted on Instagram. They were hoping that defendant's mother would persuade him to delete the video and stop posting about A.B. In the past, A.B. had talked to his parents and they were helpful. On one occasion, defendant's mother overheard defendant yelling at A.B. in his room. Defense counsel objected to A.B.'s testimony. In response, the court told the prosecutor to move on, and sustained the objection on relevancy grounds. However, the court allowed A.B.'s response that there had been "moments of violence between [A.B.] and [defendant] in front of his mom." A.B. was also permitted to testify that, although defendant did not hurt her, "he put his hands around [her] neck with no pressure," in front of his mother. This occurred when A.B. was in high school. His mother stepped in to try and calm him down.

A.B. and B.O. testified that, after talking to defendant's father on December 8, 2020, regarding the Instagram video post, A.B. and B.O. concluded that nothing was going to improve because of their conversation with defendant's father. While driving home in A.B.'s car, they stopped at a stop sign. A car approached them, made a U-turn, and pulled up next to them. B.O. thought she heard defendant yell, "Hey!" and saw him in the front passenger seat, leaning out the window, approximately 10 to 15 feet away.[3] B.O. saw him pointing a gun at A.B. and B.O. B.O. told A.B. to duck and hit the gas. As they drove away, B.O. heard six shots. B.O. testified that, on a scale of one to 10, she was eight and a half certain defendant was the front passenger. A.B. and B.O. drove to A.B.'s house, where they gave statements to sheriff's deputies. B.O. gave another statement later at the sheriff's station.

A district attorney investigator also took a statement from B.O. B.O. stated she believed defendant was the shooter because of "'everything going on in the past.'" She added that she could not see the face of the shooter. B.O. told a defense investigator she did not see who fired the shots, and could not identify the shooter because it was dark and he was wearing a mask. She also stated she could not describe the gun and did not know who was driving the other car. B.O. also testified at trial that she could not identify the shooter and could only "put pieces together." She assumed defendant was the shooter because he pointed the gun at A.B. and B.O. at the car wash.

---

[3] A.B. testified the cars were about five feet away.

Sheriff's Deputy Acosta testified he investigated the shooting on December 8, 2020, and interviewed A.B. and B.O. They appeared upset and shocked. Deputy Acosta obtained video footage from a nearby house that captured the shooting. The video did not provide a view from which it could be determined who owned the car the shooter was in. The shooting happened about 5:30 p.m., when it was dark. During a second interview of A.B., she showed Deputy Acosta a photograph of defendant with a gun that had a laser attachment. Deputy Acosta testified that there was no physical evidence placing defendant at the scene of the shooting and no witness statements placing him there, except A.B.'s statements.

Sheriff's Department Investigator Siaw testified as an expert on domestic violence. She stated that domestic violence incidents are not always reported and gave reasons for this. She further stated that abuse may be mutual and it can be difficult to determine who is the aggressor. Investigator Siaw acknowledged that victims had lied to her.

A.B.'s mother, C.T., testified she called A.B. during the evening of December 8, 2020, after checking A.B.'s location on the "Find My Friends" application and noticed A.B. was in defendant's neighborhood. A.B.'s mother knew A.B. was in a relationship with someone else, so she wanted to know why A.B. was at that location. When C.T. called A.B., she heard screams and then the call ended. C.T. called A.B. back immediately and A.B. told her what happened. C.T. told A.B. to come to C.T.'s house. A deputy sheriff arrived 15 to 30 minutes later.

Defendant's mother, F.L., testified that when A.B. was dating defendant, A.B. visited defendant and had dinner at their home on occasion. F.L. observed A.B. and defendant argue but never saw defendant strike or touch A.B. in anger. F.L. further testified that in December 2020, defendant was no longer living in Southern California, but came back for his sister's wedding on December 11, 2020. F.L. said she did not see him before then.

After the shooting, A.B. and defendant exchanged messages but did not meet in person, and A.B. did not call him until he was in jail. When he called her from jail, she accepted the calls and spoke to him because she wanted him to admit he committed the shooting, but he didn't. A.B. visited defendant in jail three times for an hour each time. A.B. admitted defendant blocked her calls multiple times while he was in jail.

III.

MOTION FOR MISTRIAL

Defendant contends the trial court violated his rights to due process and a fair trial by denying his motion for a mistrial. The motion was based on the trial court allowing evidence of prior domestic violence acts not disclosed before the trial.

A. *Incidents Disclosed for the First Time During the Trial*

Before the trial, the trial court granted the prosecution's motion in limine (MIL) under Evidence Code section 1109 seeking admission of evidence of defendant's prior uncharged acts of domestic violence, including evidence of the carwash incident and texts and photographs defendant sent A.B. after their breakup.

During the trial, defendant did not object to A.B.'s testimony on direct regarding the previously undisclosed hotel incident. During cross-examination, defense counsel asked A.B. questions about her failure to ever mention to anyone the hotel incident before the trial. During redirect examination, the prosecutor questioned A.B. about the hotel incident details. The prosecutor further elicited testimony from A.B., in which she stated that she began dating defendant in 2018, when she was 15 years old and he was 18 years old. A.B. testified that when she was 15, defendant recorded a sex video with her. She also testified she became pregnant when she was 16 and again in September 2020, when she was 18 years old. She miscarried both times. These incidents were also never revealed to defense counsel, the prosecutor, or investigators before the trial.

The prosecutor also asked A.B. about an incident that happened in defendant's mother's presence. The defense objected twice and the court overruled both objections. A.B. testified that, when defendant put his hands around her neck, defendant's mother intervened. At this point in the trial, the court ordered a lunch recess for the jury and conducted a hearing outside the presence of the jury. During the hearing, the court stated that the relevancy of A.B. and defendant's relationship in high school "was getting thin." The court indicated that too much time was being spent on defendant and A.B.'s "toxic relationship." The court noted that testimony regarding the car wash incident on December 6th was appropriate and, under Evidence Code section 352 (section 352), was more probative than prejudicial, but testimony regarding the hotel incident and incidents

11

in front of defendant's parents was questionable as cumulative and an undue consumption of time.

The court further noted that the incidents constituted domestic violence, but they had "reached the outer limit" of permissible evidence under section 352. The court requested the prosecutor to focus on the charged offenses committed on December 8, 2020, and added that the prosecutor would "have an opportunity to come back to the incidents that are before the jury at this point, but as to the specifics of their relationship and when they were in high school and all the other things, we're just too far afield." While the court indicated it understood it was "domestic violence type conduct . . . at some point it's [section] 352, and I think we're there. So I think we've reached the outer limit of that."

B. *Motion for Mistrial Procedural Background*

Defendant thereafter moved for a mistrial based on the trial court allowing evidence of prior acts by defendant, which were not previously disclosed. Defendant argued that the prosecution elicited testimony that established that defendant committed statutory rape with a minor, and defense counsel could not "unring the bell" of A.B.'s testimony that when she was in high school, she had a miscarriage because defendant cheated on her. Defense counsel further argued that the testimony prejudicially focused the jury on A.B.'s relationship with defendant when she was underage, instead of on the evidence relevant to the charges and on whether defendant was the shooter in the passenger seat.

12

The trial court stated it had not heard anything about the hotel incident until A.B.'s trial testimony, and was shocked that defendant did not object to the testimony. The court concluded that, although the evidence of defendant sending "threatening photographs" and the car wash incident were relevant and probative of defendant's intent, much of the other testimony, such as the extensive testimony about the hotel incident, A.B.'s pregnancies, and A.B. having sex with defendant as a minor, was "just not part of the case."

The trial court denied the prosecution's request to add a charge of statutory rape, but did not find that evidence of A.B.'s pregnancy miscarriages was sufficiently prejudicial to justify a mistrial, because there was no evidence defendant caused them. The court concluded that an instruction under Evidence Code section 1109 (CALCRIM No. 852) would "cure" any prejudice caused by the evidence of defendant's uncharged prior acts.

As to the other disparaging evidence, such as testimony regarding the hotel incident and the choking incident in front of defendant's mother, the trial court concluded that defendant was not prevented from receiving a fair trial because the defense could call witnesses, such as defendant's mother and grandmother, to refute the claims. Defendant was also permitted to present pinpoint limiting instructions. The court warned the prosecutor not to present any additional testimony of previously undisclosed acts without providing notice to counsel and the opportunity for the court to rule on its admissibility, because "we're getting really close to a mistrial." The prosecutor again stated that she

had not known of the newly revealed incidents, which were disclosed for the first time during A.B.'s testimony. The court responded that if any further revelations emerged "to further prejudice this jury," the court would not allow the trial to proceed.

The trial court denied defendant's motion for mistrial and A.B. resumed her trial testimony. A.B. did not mention any other incidents committed by defendant that had not been mentioned before the trial. When asked if there was any reason why she did not mention to anyone before the trial the new incidents, A.B. stated that this was because, at the time, she "thought the only thing that mattered was the shooting and the car wash incident." The trial court found "there was no wrongdoing on either side." At the end of the trial, the jury was given CALCRIM No. 852, which instructed the jury that in order to rely on evidence of uncharged acts of domestic violence, the jury must find that the uncharged incidents have been proven by a preponderance of the evidence.

C. *Forfeiture*

Defendant contends his mistrial motion should have been granted based on A.B.'s prejudicial testimony regarding acts committed by defendant which were not disclosed before the trial. Defendant forfeited this claim. A defendant may not object on appeal to the admission of evidence unless in a timely fashion, and on the same ground, the defendant objected and requested that the jury be admonished to disregard the inadmissible evidence. (*People v. Stanley* (2006) 39 Cal.4th 913, 952.)

14

Under Evidence Code section 353, "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶]  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and  [¶]  (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

In accordance with this statute, courts have "consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable.  [Citation.]"  (*People v. Seijas* (2005) 36 Cal.4th 291, 302; see also *People v. Partida* (2006) 37 Cal.4th 428, 433-434.)  This is because "a specifically grounded objection to a defined body of evidence serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal."  (*People v. Morris* (1991) 53 Cal.3d 152, 187-188; see also *People v. Partida*, *supra*, 37 Cal.4th at p. 434.)

Defendant's motion for mistrial was based on A.B. testifying regarding acts and threats of violence committed by defendant against her, which were not previously disclosed to anyone, including investigators, counsel, or the court. Such testimony included A.B. mentioning the hotel incident. It is undisputed that defendant's trial attorney did not timely object to A.B.'s testimony regarding undisclosed prior incidents. Defendant did not object to the evidence until defense counsel moved for a mistrial, upon the trial court mentioning it was surprised the defense had not objected to A.B.'s testimony regarding the hotel incident.

D. *Denial of Defendant's Motion for Mistrial*

Even assuming defendant's evidentiary challenges were not forfeited, we conclude on the merits that the trial court did not abuse its discretion or deprive defendant of due process and a fair trial when it denied defendant's motion for mistrial.

"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ""a [defendant's] chances of receiving a fair trial have been irreparably damaged."'" [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 198; see also *People v. Harris* (2013) 57 Cal.4th 804, 848; *People v. Dement* (2011) 53 Cal.4th 1, 39-40 ["'Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a

16

finding of incurable prejudice.' [Citation.]"].) "We review the denial of a motion for mistrial under the deferential abuse of discretion standard." (*People v. Cox* (2003) 30 Cal.4th 916, 953.)

We conclude the court did not abuse its discretion when denying defendant's mistrial motion, because the trial court did not act unreasonably when concluding defendant was not incurably prejudiced by A.B.'s testimony regarding acts committed by defendant which were not disclosed before the trial. (*People v. Elliott* (2012) 53 Cal.4th 535, 575.)

It was not until A.B. testified at trial that the prosecutor became aware of the hotel incident, choking incident in front of defendant's mother, and other acts and threats of violence committed by defendant against A.B. These acts were not previously disclosed to anyone, including investigators, counsel, or the court.

The record on appeal shows that, when ruling on the mistrial motion, the court carefully considered the circumstances leading to A.B.'s unanticipated testimony, and reasonably concluded it did not constitute incurable prejudice or preclude defendant from having a fair trial. The court permitted defendant to present pinpoint instructions to address any potential prejudice caused by the evidence of defendant's uncharged prior acts, and at the end of the trial, the court instructed the jury on domestic violence evidence under Evidence Code section 1109 (CALCRIM No. 852). The court concluded that giving this instruction would cure any harm. In addition, the charged shooting

17

incident was sufficiently distinct and distinguishable from the uncharged hotel incident, such that it was unlikely the jury would confuse the two incidents.

The trial court also concluded that the other incidents which A.B. disclosed for the first time at trial "were certainly not as severe" as the charged offense of defendant shooting at A.B. and B.O. from a moving car, and therefore were not more inflammatory. Because the charged shooting incident was far more severe than the other uncharged prior incidents committed by defendant, it is also unlikely that A.B.'s testimony created any confusion as to which acts were the charged offenses. Defendant concedes this in his reply brief, but adds, "[S]o what? The problem posed by the admission of this inflammatory testimony is not confusion; it's the likelihood that it would persuade the jury to resolve any doubts about the identity of the shooter against appellant."

We are not persuaded by this argument. There was substantial evidence that defendant was the shooter, and the evidence of A.B.'s testimony regarding her relationship with defendant and his violent and threatening acts toward her are no more inflammatory than evidence of the car wash incident and other admissible evidence demonstrating defendant's violent and threatening acts toward A.B.

Furthermore, some of A.B.'s testimony regarding the hotel incident and her relationship with defendant was elicited by defense counsel. In addition, as noted by the trial court regarding A.B.'s testimony about the hotel incident and choking incident, defendant could call his mother and grandmother to attempt to refute A.B.'s testimony. Also, the parties stipulated that A.B. had never disclosed before the trial any incidents

18

involving defendant, other than the car wash incident and the charged shooting, despite A.B. having made five statements to law enforcement investigators before the trial. This stipulated statement read to the jury benefited defendant by weighing negatively against A.B.'s credibility.

Under these circumstances, we conclude that the trial court did not exercise its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice when denying defendant's mistrial motion. The record demonstrates that the trial court denied the motion for mistrial after reasonably finding that no injustice had or would result from A.B.'s unanticipated testimony of defendant's undisclosed violent acts against A.B., and that there was no incurable prejudice. (*People v. Gray* (1998) 66 Cal.App.4th 973, 986.)

We further reject defendant's contention that A.B.'s trial testimony regarding defendant's undisclosed violent acts against A.B., and A.B.'s miscarriage when she was 16 years old, undermined the fairness of the trial. As discussed above, we conclude the trial court's denial of defendant's mistrial motion was not an abuse of its discretion, and there was no incurable prejudice.

Furthermore, the trial court reasonably concluded that A.B.'s testimony regarding the hotel incident and choking incident did not prevent defendant from receiving a fair trial or due process, because the defense could call witnesses, such as defendant's mother and grandmother, to refute the claims. The court also gave the jury CALCRIM No. 852, which required the jury to find that the uncharged incidents must be proven by a

preponderance of evidence before the jury could consider them. In addition, the court told defendant he could present pinpoint limiting instructions. Based on these circumstances, we conclude defendant received a fair trial and the errors complained of did not result in a miscarriage of justice.

E. *Ineffective Assistance of Counsel*

Defendant also has not demonstrated IAC because it is not reasonably likely the outcome of the case would have been any different had defense counsel timely objected to A.B.'s trial testimony regarding the undisclosed acts. Defendant argues in his opening brief that "it is clear that the failure to object when the subjects were first broached by the prosecution cannot be ascribed to any tactical calculation." Defendant further argues that "Counsel offered no explanation for failing to object either at that point, or at any other point throughout the ensuing colloquy, which went on for the next several minutes. There simply is no valid tactical basis for not objecting at any point . . . ."

"An appellant claiming [IAC] has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. [Citations.] . . . [¶] To establish prejudice, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.] In demonstrating prejudice, the appellant 'must carry his burden of proving prejudice as a

20

"demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' [Citation.]" (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1146-1147; *People v. Loza* (2012) 207 Cal.App.4th 332, 350.)

"In determining whether counsel's performance was deficient, we exercise deferential scrutiny. [Citations.] The appellant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics. [Citation.] [¶] Our Supreme Court recently reiterated the obligations of appellate courts in reviewing claims of [IAC]: 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of [IAC] [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of professional assistance."' [Citation.]" (*People v. Montoya*, *supra*, 149 Cal.App.4th at p. 1147; *People v. Loza*, *supra*, 207 Cal.App.4th at p. 351.)

Even assuming there was no valid tactical basis for defendant's trial attorney not timely objecting to the evidence in question, as discussed above, defendant has not demonstrated that A.B.'s testimony was sufficiently prejudicial for purposes of establishing IAC. Defendant has not shown that there is a reasonable probability that, but for defense counsel's failure to object to A.B.'s testimony disclosing defendant's prior violent misconduct and A.B.'s miscarriage when 16 years old, the result of the proceeding would have been different. (*People v. Loza*, *supra*, 207 Cal.App.4th at p. 350.)

21

IV.

EXCLUSION OF EVIDENCE THE SHOOTING

WAS IN A HIGH CRIME AREA

Defendant contends the trial court committed prejudicial error by excluding evidence that the shooting occurred in a high crime area. The trial court excluded the evidence because it concluded that the testimony was irrelevant to whether defendant was the shooter and there was insufficient evidence of third-party culpability.

Defendant requested the trial court to allow him to introduce testimony by his mother that the area where the shooting occurred was a high crime area where shootings were common. Defendant's mother had found bullet strike marks on her house and vehicle. Defendant argues that evidence the shooting occurred in a high crime area was highly relevant because it is "logically" more likely the shooting was unrelated to A.B. and defendant in a neighborhood where shootings were frequent.

Defendant further argues that the testimony requested was not third-party culpability evidence because it did not identify any third party. In addition, defendant argues that A.B. and B.O., who identified defendant as the shooter, were not credible witnesses because they provided inconsistent testimony and statements. Therefore, their identification of defendant as the shooter was unreliable, and evidence that the shooting occurred in a high crime area would refute their identification of defendant as the shooter. Defendant concludes that precluding the evidence was therefore prejudicial error, because

it was reasonably probable that defendant would have obtained a better result had the evidence been permitted.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069; *People v. Powell* (2018) 5 Cal.5th 921, 951.)  "When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error." (*People v. Powell*, *supra*, at p. 951, citing *Watson*, *supra*, 46 Cal.2d at p. 836.)  "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, at p. 836.)

Here, defendant argued he was not the shooter, but he did not present any evidence of third-party culpability.  His defense consisted primarily of attacking A.B. and B.O.'s credibility based on their inconsistent testimony and statements to investigators.  Defendant also challenged A.B.'s credibility based on her disclosing for the first time at trial threats and violent acts committed by defendant against her.  The trial court reasonably concluded that there was no evidence that a third party committed the shooting and, therefore, evidence that the charged shooting occurred in a high crime neighborhood was irrelevant.

Furthermore, even if the high-crime neighborhood evidence was admissible, exclusion of the evidence was harmless error because it is not reasonably probable that a result more favorable to defendant would have been reached had the evidence been permitted. (*Watson*, *supra*, 46 Cal.2d at p. 836.) There was no evidence that a third party committed the shooting, whereas there was substantial evidence defendant did.

Evidence supporting the jury's finding that defendant committed the charged shooting offense includes evidence that both A.B. and B.O. identified defendant as the shooter and testified they saw and heard him during the shooting incident. A.B. testified she saw defendant point a gun at her and fired at her car, but "missed." In addition, defendant's conduct preceding the shooting provided strong support for the jury's finding that defendant was the perpetrator. There was evidence that, after A.B. and defendant broke up, he told A.B. that, if he could not have her, no one could; he began sending A.B. photographs of himself with guns, including one with a laser attachment like the one observed during the shooting incident; and two days before the shooting incident, defendant pointed a gun with a laser attachment at A.B. and B.O. at a car wash. Also, as recorded by video, later that day defendant pointed a gun with a laser attachment at A.B. and B.O. from a car as he passed by A.B. and B.O. at the scene of a car accident involving A.B.'s car. In addition, the shooting two days later occurred a block from defendant's parents' home, right after A.B. and B.O. visited defendant's parents and complained about defendant's conduct.

24

We therefore conclude, based on the totality of the evidence, that it is not reasonably probable that a result more favorable to defendant would have been reached had he been permitted to present evidence that the shooting occurred in a high crime area.

V.

SENTENCING ERROR

The parties agree, as does this court, that the trial court erred in imposing concurrent sentences on counts 3 and 4 (assault with a semi-automatic firearm (§ 245, subd. (b)). It is also agreed that, accordingly, the sentences on counts 3 and 4 must be stayed under section 654 because these counts were based on the same acts for which sentence was imposed on counts 1 and 2 (premeditated attempted murder).

"Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct." (*People v. Deloza* (1998) 18 Cal.4th 585, 591; § 654.) Under section 654, subdivision (a), "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

If a defendant has two convictions, "punishment for one of which is precluded by section 654, that section requires the sentence for one conviction to be imposed, and the other imposed and then stayed. [Citation.] Section 654 does not allow any multiple punishment, including either concurrent or consecutive sentences. [Citation]. [¶]

25

Section 654 does not, however, preclude multiple punishment when the defendant's violent act injures different victims. [Citations.]" (*People v. Deloza* (1998) 18 Cal.4th 585, 592.)

Here, the parties agree, as does this court, that section 654 applies to defendant's convictions for counts 3 and 4, because they are based on the same acts as his conviction for counts 1 and 2. Therefore the trial court erred in imposing sentences for counts 3 and 4 concurrently, rather than staying the sentences.

VI.

DISPOSITION

Defendant's concurrent sentences for counts 3 and 4 are ordered stayed under section 654. In all other regards, the judgment and sentence are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

RAMIREZ

P. J.

MILLER

J.

26